NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0878-14T2

APPROVED FOR PUBLICATION

December 11, 2015

APPELLATE DIVISION

IN THE MATTER OF THE ESTATE
OF MICHAEL D. FISHER, II.

_____

Argued November 18, 2015 — Decided December 11, 2015

Before Judges Ostrer, Haas and Manahan.

On appeal from Superior Court of New Jersey, Chancery Division, Cape May County, Docket No. P-20-14.

Michael A. Gill argued the cause for appellant Michael D. Fisher, Sr., (Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill, attorneys; Mr. Gill, on the briefs).

I. Dominic Simeone argued the cause for respondent Justina M. Nees, individually and as administratrix (Simeone & Raynor, LLC, attorneys; Mr. Simeone, of counsel and on the brief; Bryan T. Eggert and Kenneth E. Raynor, on the brief).

The opinion of the court was delivered by

HAAS, J.A.D.

In this case of first impression, appellant Michael D. Fisher, Sr. appeals from a September 10, 2014 order, granting respondent Justina Nees's application to bar him from receiving a share of the intestate estate of their deceased son.  Because

we conclude that Nees failed to demonstrate that Fisher "abandoned" the child "by willfully forsaking" him within the intendment of the governing statute, N.J.S.A. 3B:5-14.1(b)(1), we reverse.

I.

We derive the following facts from the parties' pleadings and certifications. The parties were married in 1994 and had one child, Michael, born in February 1995.

The parties separated in April 2001.[1] One month later, Nees obtained a Final Restraining Order (FRO) against Fisher after he attempted to remove Michael from school without first notifying her. Under the terms of the FRO, Fisher was permitted to have supervised parenting time with Michael at Fisher's psychologist's office. The FRO also ordered Fisher to submit to a risk assessment and to "receive professional domestic violence counseling[.]" Fisher did not attend all of his supervised parenting time sessions with his son. He also did not appear for the risk assessment or counseling.

---

[1] According to Nees's certification, the separation was prompted by Fisher's December 2000 arrest for peering into the window of a dwelling, which resulted in his indictment for fourth-degree criminal trespass, N.J.S.A. 2C:18-3(c). Fisher had previously been arrested in April 1996 for lewdness, N.J.S.A. 2C:14-4, and, in November 1999, for another incident of peering into the window of a dwelling, N.J.S.A. 2C:18-3(c). The record does not reveal whether any of these arrests led to convictions.

In November 2001, Fisher filed a motion, seeking permission to have unsupervised parenting time with Michael. In response, Nees filed a cross-motion, requesting that all of Fisher's parenting time be supervised until he completed the anger management program and the risk assessment.

On January 29, 2002, the court temporarily suspended Fisher's parenting time pending his enrollment in an anger management program and completion of an assessment by the "Family Court Assessment Team." In his decision, the judge remarked "that [Fisher] ha[d] not exerted himself to take the basic steps" set forth in the FRO concerning the required risk assessment and counseling and stated that Fisher's "contumacious disregard of the court's explicit requirements" supported the denial of Fisher's request for unsupervised parenting time.

On March 7, 2002, the court entered a Final Judgment of Divorce (FJOD), which incorporated the terms of the parties' agreement as to the terms of the dissolution. The FJOD granted sole custody of Michael to Nees, with Fisher's parenting time remaining suspended until he complied with the January 29, 2002 order. Fisher agreed to pay Nees $85 per week[2] in child support

---

[2] By 2010, Fisher's child support obligation had increased to $105 per week.

for Michael, with the payments to be made through the County Probation Department by way of wage garnishment.

In Fisher's certification, he stated:

> During our divorce litigation, [Nees] made an offer to me, through our attorneys, that she would not ask for any child support if I were to agree to give up my parental rights to Michael. I emphatically said that I would absolutely never agree to that. Although I was having financial difficulties, I was never going to give up my parental rights to Michael in consideration for no child support. I wanted to have a relationship with Michael.

Nees did not contradict Fisher's statement in her pleadings.

Fisher did not "present[] himself for the" Family Court Assessment Team evaluation required by the January 29, 2002 order. Therefore, on May 8, 2002, the trial court sent the parties a letter stating that "the suspension of [Fisher's] visitation with Michael . . . continues in full force and effect."

From January 2002 until Michael's death at the age of fifteen on September 24, 2010, Fisher "never had any legal visitation with his son." Fisher spoke to Michael during "some" telephone conversations in 2001 and 2002. Fisher stated he "would occasionally see Michael in public places." One summer, he saw Michael on a beach, approached him, and began talking to his son. At that point, Nees appeared, reminded Fisher of the

FRO, and told him she would call the police if he did not leave. Fisher complied.

In 2006, Fisher moved to Florida. Fisher certified that he was going "through some difficult times including having significant health issues." He fell behind in his child support obligations and, by 2010, was over $10,000 in arrears.

In May 2010, Fisher filed a motion to decrease or terminate his child support obligation. Fisher stated that he was diagnosed with a serious health condition in February 2008 and could no longer work as a painter. Nees opposed the motion and attached a photograph of Fisher working on a ladder in 2009 to her pleadings.[3] On July 6, 2010, the trial judge granted Fisher's motion and terminated his child support obligation as of May 13, 2010, the date he filed his motion. The judge explained his ruling as follows:

> [Fisher] has demonstrated that his circumstances have changed so that the current child support order is no longer feasible. [Fisher] is seriously ill and unable to work. There is no indication that he will recover and be able to resume work. Although [Nees] has provided a picture of [Fisher] working, this does not, in the court's view, outweigh the medical information [Fisher] has provided and his statements that he is unable to work. Even if [Fisher] did work for a day or two in October, that does not mean he can work now

---

[3] Nees obtained the photograph from Fisher's Facebook page.

> or has been able to work consistently for the past two years. It is pointless and impractical to maintain a child support order which [Fisher] cannot now and may never be able to pay.[4]

Fisher stated that, about two months before Michael's death, Fisher "located" his son on Facebook and sent him some messages. Michael responded to the messages. However, Fisher then discovered he "was blocked" from Michael's account. Fisher certified that he did not "know who orchestrated that or why."

In August 2010, Nees filed a motion to reinstate Fisher's child support obligation or, in the alternative, to require Fisher to apply for Social Security Disability benefits. Fisher did not file any opposition to the motion. On September 24, 2010, the judge ordered Fisher to apply for the benefits within thirty days. However, Michael passed away later that day.[5]

Fisher learned of his son's death from a relative and returned to New Jersey to attend the funeral. Nees stated that she asked Fisher "to pay for half of the funeral costs and he would not do so."

---

[4] Despite the court's order terminating his ongoing child support obligation, Fisher remained responsible for paying the accrued arrears. Fisher continued to make payments toward that obligation after Michael's death and, by the time of the proceedings involved in this appeal, had reduced the arrears to approximately $5000.

[5] Nees asserts that Michael's death was "caused by the wrongful act, negligence or recklessness of his physicians . . . ."

Michael died intestate and, with Fisher's consent, Nees was appointed on June 1, 2012 as the administratrix and administratrix ad prosequendum of Michael's estate.

Because Michael had no spouse or children, his parents would each share equally in his intestate estate. N.J.S.A. 3B:5-4(b). However, N.J.S.A. 3B:5-14.1, which became effective on July 1, 2009, provides in pertinent part that:

> b. A parent of a decedent shall lose all right to intestate succession in any part of the decedent's estate . . . if:
>
> (1) The parent refused to acknowledge the decedent or abandoned the decedent when the decedent was a minor by willfully forsaking the decedent, failing to care for and keep the control and custody of the decedent so that the decedent was exposed to physical or moral risk without proper and sufficient protection, or failing to care for and keep the control and custody of the decedent so that the decedent was in the care, custody and control of the State at the time of death . . . .
>
> [(emphasis added)].[6]

On March 21, 2014, Nees filed a verified complaint seeking to bar Fisher from receiving a share of Michael's estate under

---

[6] The other provisions of N.J.S.A. 3B:5-14.1 prevent parents from taking under the intestacy scheme if they have committed certain enumerated crimes against the decedent, or "[t]he parent abused or neglected the decedent . . . , and the abuse or neglect contributed to the decedent's death." N.J.S.A. 3B:5-14.1(b)(2)-(4). These provisions are not applicable here.

N.J.S.A. 3B:5-14.1(b).  She alleged that Fisher abandoned Michael after the parties' divorce by failing to have any contact with the child or pay his full child support obligation. On that same date, the Chancery Division issued an order to show cause.  Fisher filed an answer to the complaint, denying that he abandoned his son.

Following oral argument on the return date of the order to show cause,[7] the trial judge granted Nees's request to bar Fisher from receiving a share of Michael's intestate estate.  In his written opinion, the judge found that "N.J.S.A. 3B:5-14.1(b)(1) bars a parent from inheriting a share of his [or her] child's intestate estate if that parent abandoned that child by willfully forsaking him [or her]" and stated that the "court's task [was] to determine whether the actions and inactions of [Fisher], in the context of the previous court orders limiting his parental rights, qualify as a willful forsaking."

In conducting this analysis, the judge did not refer to any of the case law interpreting the terms "abandoned" and "willfully forsaking" in other contexts.[8]  Instead, the judge

---

[7] Neither party requested an evidentiary hearing, and the trial judge found that "[t]he material facts at issue in this matter are not in dispute."  The parties have not contested that finding on appeal.

[8] We will discuss these cases below.

referred to a dictionary definition of the word "willful," which defined the term as "'[p]roceeding from a conscious motion of the will; voluntary; [i]ntending the result which actually comes to pass; designed; intentional; not accidental or involuntary.'"

The judge then summarized the facts in the record supporting his determination that Fisher "abandoned his son by willfully forsaking him." The judge found that, although Fisher's parenting time had been limited by the FRO and the FJOD, Fisher still had the opportunity for supervised parenting time with Michael if he complied with the court's directives. However, Fisher failed to attend the supervised sessions and, when those sessions were suspended, failed to submit to a risk assessment or complete counseling in order to regain the opportunity to resume parenting time with Michael. The judge highlighted the comments made by the court in the January 29, 2002 order that Fisher had "'continued his contumacious disregard for the orders of [the] court by not cooperating or presenting himself for the [required] evaluations.'"

The judge noted that Fisher had no contact with his son after 2002, and moved to Florida in 2006. The judge also found that Fisher "failed to voluntarily comply with his child support obligations, which resulted in a wage garnishment and

9

substantial arrears as of the date of his son's death."  Thus,
the judge concluded:

> Previously, [Fisher], as a result of
> his own actions, was subject to severe
> limitations of his parental rights.
> [Fisher] failed to complete any of the
> court[-]mandated prerequisites to continue
> visitations with his son or regain his full
> parental rights.  [Fisher] failed to provide
> his son with any voluntary financial support
> over the remainder of his life.  Although
> his rights with respect to his son had been
> limited by [the] court, the facts here
> demonstrate that [Fisher] abandoned what
> relationship remained.

At the same time, however, the judge stated that "[t]he
court does not question that [Fisher] cared for his son or mean
to imply that it was his purpose or specific intent to abandon
him."  The judge observed:

> The paradigm case of abandonment by
> willfully forsaking [a child] would be where
> a parent, with uninhibited rights of custody
> and visitation, chooses to leave the
> familial unit, has no further involvement
> with the child, and provides no voluntary
> support for the child.  This is not such a
> case.

Finally, the judge stated, "[a]dmittedly, it may not have been
[Fisher's] specific intent or purpose to abandon his son."

In spite of these findings, the judge granted Nees's
application, stating that Fisher's

> acts were unequivocally intentional rather
> than accidental or involuntary.  His choice
> not to attend his supervised visits with his

son and court[-]mandated anger management therapy was not accidental or involuntary. His failure to voluntarily fulfill his child support obligations was not accidental or involuntary. And ultimately, the absence of his presence from the remainder of his son's regrettably short life was not accidental or involuntary.

This appeal followed.[9]

## II.

Whether Fisher "abandoned" Michael turns upon an interpretation of N.J.S.A. 3B:5-14.1(b)(1). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference" on appeal. Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995). "On appeal, a trial judge's statutory interpretation is reviewed de novo." Commerce Bancorp, Inc. v. InterArch, Inc., 417 N.J. Super. 329, 334 (App. Div. 2010) (citing State v. Gandhi, 201 N.J. 161, 176 (2010)), certif. denied, 205 N.J. 519 (2011).

"It is well settled that the goal of statutory interpretation is to ascertain and effectuate the Legislature's intent." State v. Olivero, 221 N.J. 632, 639 (2015) (citing Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)).

---

[9] On October 17, 2014, the judge granted Fisher's motion to enjoin and restrain Nees from distributing funds from Michael's estate that would have passed to Fisher pending appeal.

Our analysis of a statute begins with its plain language, giving the words their ordinary meaning and significance. <u>Ibid.</u> "It is a basic rule of statutory construction to ascribe to plain language its ordinary meaning." <u>Bridgewater-Raritan Educ. Ass'n v. Bd. of Educ.</u>, 221 <u>N.J.</u> 349, 361 (2015) (citing <u>D'Annunzio v. Prudential Ins. Co. of Am.</u>, 192 <u>N.J.</u> 110, 119-20 (2007)). "When that language 'clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms.'" <u>Olivero</u>, <u>supra</u>, 221 <u>N.J.</u> at 639 (quoting <u>McCann v. Clerk of Jersey City</u>, 167 <u>N.J.</u> 311, 320 (2001)).

However, if there is any ambiguity in the statutory language, a court may look at extrinsic evidence "such as 'the statute's purpose, legislative history, and statutory context.'" <u>State v. Fortin</u>, 178 <u>N.J.</u> 540, 607 (2004) (quoting <u>Twp. of Pennsauken v. Schad</u>, 160 <u>N.J.</u> 156, 170 (1999)). A court may also consider "extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language." <u>DiProspero v. Penn</u>, 183 <u>N.J.</u> 477, 493 (2005).

As noted above, <u>N.J.S.A.</u> 3B:5-14.1(b)(1) provides in pertinent part:

> b. A parent of a decedent shall lose all right to intestate succession in any part of the decedent's estate . . . if:

> (1) The parent refused to acknowledge the decedent or abandoned the decedent when the decedent was a minor by willfully forsaking the decedent, failing to care for and keep the control and custody of the decedent so that the decedent was exposed to physical or moral risk without proper and sufficient protection, or failing to care for and keep the control and custody of the decedent so that the decedent was in the care, custody and control of the State at the time of death . . . .

Fisher contends that the trial judge erred in only considering the first phrase of N.J.S.A. 3B:5-14.1(b)(1) and determining that Fisher "abandoned" Michael by "willfully forsaking him." Fisher states that the two phrases that follow were meant to modify the words "abandoned the decedent . . . by willfully forsaking him." Thus, Fisher argues that a parent may lose his or her right to intestate succession under the statute only if the abandonment resulted in the child being "exposed to physical or moral risk without proper and sufficient protection," or having to be placed "in the care, custody and control of the State" prior to his or her death. Because there is no evidence that Fisher's actions exposed Michael to "physical or moral risk" or caused him to become a ward of the State, Fisher argues that the judge should not have determined that he abandoned his son. We disagree with Fisher's interpretation of N.J.S.A. 3B:5-14.1(b)(1).

As noted above, the plain language of a statute "is typically the best indicator of intent." In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 467 (2013). Fisher's proposed interpretation ignores the punctuation used and the Legislature's inclusion of the word "or" in the statute. "Punctuation is part of an act and may be considered in its interpretation." Commerce Bancorp, supra, 417 N.J. Super. at 336 (quoting Moore v. Magor Car Corp., 27 N.J. 82, 87 (1958)). "[T]he word 'or' in a statute is to be considered a disjunctive particle indicating an alternative." State v. Kress, 105 N.J. Super. 514, 520 (Law Div. 1969).

"When[, as here,] items in a list are joined by a comma or semicolon, with an 'or' preceding the last item, the items are disjunctive." State v. Smith, 262 N.J. Super. 487, 506 (App. Div. 1993). Thus, purely as a matter of grammar, the three clauses in N.J.S.A. 3B:5-14.1(b)(1) are distinct and separate from each other.

Based on this well-established rule of statutory construction and the plain language of the statute, we conclude that a parent may lose his or her right to intestate succession if the parent abandoned the decedent when he or she was a minor by: (1) "willfully forsaking the decedent"; (2) "failing to care for and keep the control and custody of the decedent so

that the decedent was exposed to physical or moral risk without proper and sufficient protection"; or (3) "failing to care for and keep the control and custody of the decedent so that the decedent was in the care, custody and control of the State at the time of death . . . ."

"When the Legislature's chosen words lead to one clear and unambiguous result, the interpretative process comes to a close, without the need to consider extrinsic aids." State v. Buckley, 216 N.J. 249, 263 (2013) (quoting State v. Shelley, 205 N.J. 320, 323 (2011)). Therefore, we need proceed no further in considering Fisher's argument on this point. Nevertheless, the legislative history of N.J.S.A. 3B:5.14.1(b)(1) fully supports our conclusion that a parent may abandon his or her child by taking any of the three specific actions set forth in the statute.

As originally introduced on May 12, 2008, Assembly Bill 2681, (the bill that was eventually enacted as N.J.S.A. 3B:5-14.1), defined the term "abandonment" only by a specific reference to N.J.S.A. 9:6-1, without the inclusion of the language of that statute. In pertinent part, N.J.S.A. 9:6-1 provides:

> Abandonment of a child shall consist of any of the following acts by anyone having the custody or control of the child: (a) willfully forsaking a child; (b) failing to

> care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child caring societies or private persons not legally chargeable with its care or their care, custody and control.

As is readily apparent from an examination of the language it used in the final version of N.J.S.A. 3B:5-14.1(b)(1), (L. 2009, c. 43), the Legislature simply replaced its "shorthand" reference to N.J.S.A. 9:6-1 in the original bill with virtually the same language set forth in that statute. Indeed, the main difference between the two statutes is that, when it enacted N.J.S.A. 3B:5-14.1(b)(1), the Legislature neglected to include specific letter designations ((a), (b), and (c)) for the three subsections of the statute as it did in N.J.S.A. 9:6-1. This omission, however, is of no moment because, as discussed above, the punctuation and language the Legislature used in N.J.S.A. 3B:5-14.1(b)(1) clearly demonstrate that "abandonment" under that statute, as was the case under N.J.S.A. 9:6-1, can consist of three distinct actions. See In re Petition for Referendum on City of Trenton Ordinance 09-02, 201 N.J. 349, 359 (2010) ("When reviewing two separate enactments, the [c]ourt has an affirmative duty to reconcile them, so as to give effect to both

16

A-0878-14T2

expressions of the lawmakers' will.") (quoting St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14 (2005)).

Fisher makes a final argument in support of his contention that a parent may only lose his or her right to a child's intestate estate if the abandonment exposes the child to the risk of physical harm. The sponsor of Senate Bill 1640, which was the Senate's version of Assembly Bill 2681, appended a statement to the bill when it was introduced. In pertinent part, the statement provided:

> This bill is in response to a recent decision of the Superior Court of New Jersey, Appellate Division, which held that the mother of an abused, abandoned, and neglected child was not entitled to inherit the $1 million the State paid to her son's estate to settle a lawsuit. The court concluded, using its equitable powers, that allowing the woman whose abuse and neglect led to the child's death to collect that child's inheritance would be "cruel, ironic, and inequitable." This bill seeks to fill the gap in the statutory law on this issue.
>
> [Sponsor's Statement to S. 1640, at 4 (May 5, 2008).]

The sponsor's statement refers to our decision in New Jersey Division of Youth and Family Services v. M.W., 398 N.J. Super. 266 (App. Div.), certif. denied, 196 N.J. 347 (2008). In that case, the mother abused her three children and then left them in the care of a cousin who burned, beat, restrained, starved, and confined the children in a basement without access

to a bathroom.  Id. at 271-279.  Two of the children were eventually rescued, but the third child was found dead in the basement.  Id. at 274.  The Division was supposed to be supervising and providing services to the children, but it failed to do so.  Id. at 277-82.

While she was still in jail, the mother brought an action against the Division on behalf of the two surviving children, "alleging that the Division had negligently failed to protect her children from abuse while they were in the care of" the cousin.  Id. at 282-83.  The Division settled the case and, as part of the settlement, agreed to pay $1 million to the deceased child's estate.  Id. at 283.

Because N.J.S.A. 3B:5-14.1 had not yet been enacted, there was no statute to prevent the mother from inheriting the $1 million.  However, the trial court granted the Division's application to retroactively terminate the mother's parental rights to prevent the inheritance from taking place.  Id. at 285-286.  On appeal, we upheld the trial court's decision.  Id. at 286.

In our ruling, we noted that New Jersey had not "adopted a statutory exception to the mandatory succession by intestacy statutes applicable to children to extinguish the inheritance rights of 'bad parents.'"  Id. at 292.  In the present case,

Fisher argues that, based on the sponsor's statement that Senate Bill 1640 would address the horrific situation involved in M.W., N.J.S.A. 3B:5-14.1(b)(1) should be interpreted to only apply to acts constituting "abandonment" that result in death or serious harm to the child. This argument lacks merit.

A statement appended to a proposed bill is often "a highly persuasive indication of legislative intent." Toogood v. St. Andrews Condo. Ass'n, 313 N.J. Super. 418, 425 (App. Div. 1998) (citing Helfrich v. Hamilton Twp., 182 N.J. Super. 365, 371 (App. Div. 1981)). And, we do not doubt that the tragic circumstances of M.W. prompted the Legislature to examine the issues raised by that case. Thus, N.J.S.A. 3B:5-14.1(b)(4) prohibits a parent from sharing in his or her deceased child's estate if "[t]he parent abused or neglected the decedent . . . , and the abuse or neglect contributed to the decedent's death." That provision specifically covers the problem presented in M.W.

As demonstrated above, however, the Legislature did not limit N.J.S.A. 3B:5-14.1 only to cases where a parent causes serious physical or emotional harm to a child. By enacting subsection (b)(1), the Legislature obviously intended to address a broader array of concerns, including a situation where a parent "abandoned the decedent when the decedent was a minor by

willfully forsaking the decedent . . . ."[10]  Therefore, we reject Fisher's contention on this point.

### III.

We now turn to the question of whether Fisher "abandoned" Michael when he was a minor by "willfully forsaking him" within the intendment of N.J.S.A. 3B:5-14.1(b)(1).  In construing this statutory provision, the trial judge focused only on the word "willfully", which he defined through the use of a dictionary.  "But dictionary definitions are not necessar[ily] a reliable guide to the meaning of words of  . . . statutes of this breadth and significance."  Whateley v. Leonia Bd. of Educ., 141 N.J. Super. 476, 479 (Ch. Div. 1976).  Indeed, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to

---

[10] Less than a year before Assembly Bill 2681 was introduced, we observed that no statute then in effect prevented a parent, who never provided any support for their child, from inheriting from the child's intestate estate.  In re Rogiers, 396 N.J. Super. 317, 326 (App. Div. 2007).  In our opinion, we noted that the Legislature was then considering a bill that would eliminate the inheritance rights of a surviving parent if that parent had abandoned the child and another bill that would do the same if the parent failed to provide support to the child while the child was alive.  Ibid.  Thus, in its review of the subject of intestate succession in the estates of children, the Legislature was obviously considering a host of issues and did not limit its review to circumstances similar to what occurred in M.W.

their meaning." Wilde v. Wilde, 341 N.J. Super. 381, 394 (App. Div. 2001) (quoting Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S. Ct. 193, 90 L. Ed. 165 (1945)).

Here, the terms "abandoned" and "willfully forsaking" have been construed in several of our prior decisions concerning N.J.S.A. 9:6-1. "There is a long-standing canon of statutory construction that presumes that the Legislature is knowledgeable regarding the judicial interpretation of its enactments." Coyle v. Bd. of Chosen Freeholders, 170 N.J. 260, 267 (2002) (citing State v. Burford, 163 N.J. 16, 20 (2000)). Therefore, these decisions, rather than a dictionary definition of one of the statute's terms, would most likely have guided the Legislature in its enactment of N.J.S.A. 3B:5-14.1(b)(1).

None of our prior cases have interpreted the language of N.J.S.A. 3B:5-14.1(b)(1). However, as already noted, the terms of that statute are almost identical to those used in N.J.S.A. 9:6-1. Both statutes state that abandonment can occur when a parent willfully forsakes his or her child. Thus, cases interpreting N.J.S.A. 9:6-1 are particularly relevant to our current analysis.

The leading case construing the terms of N.J.S.A. 9:6-1 is Lavigne v. Family & Children's Soc'y, 11 N.J. 473 (1953). In

that case, the parents took their seven-month old child to a child adoption agency, which agreed to place her in a temporary foster home. Id. at 475-76. Eventually, the parents "executed a formal surrender and consent to" the child's adoption. Id. at 476. Fourteen months later, the father attempted to have the child returned to him. Id. at 478.

On these facts, the Court found "that the actions of the [parents] constitute[d] an abandonment of their child under" N.J.S.A. 9:6-1. Id. at 480. In defining the word "abandonment," the Court stated:

> The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.
>
> [Ibid. (quoting Winans v. Luppie, 47 N.J. Eq. 302, 304 (E. & A. 1890)).]

The Court also emphasized that the parent's "purpose" to abandon the child must be "clearly manifested[.]" Ibid. (quoting Winans, supra, 47 N.J. Eq. at 304). In that same vein, we defined the term "forsaking" as used in N.J.S.A. 9:6-1 as a "permanent giving up or relinquishment of the child." State v.

N.I., 349 N.J. Super. 299, 312 (App. Div. 2002).[11] "[T]he word willfully used in conjunction with forsaking . . . 'means intentionally or purposely as distinguished from inadvertently or accidentally.'" Ibid. (quoting State v. Burden, 126 N.J. Super. 424, 427 (App. Div.), certif. denied, 65 N.J. 282 (1974)).

After carefully reviewing these precedents and distilling them to their essence, we hold that, in order for a court to conclude that a parent has "abandoned" his or her child "by willfully forsaking" him or her under N.J.S.A. 3B:5-14.1(b)(1), the court must find that the parent, through his or her unambiguous and intentional conduct, has clearly manifested a settled purpose to permanently forego all parental duties and relinquish all parental claims to the child.

The Legislature did not specify what standard of proof should apply under N.J.S.A. 3B:5-14.1(b)(1) when a party seeks to bar a parent from succeeding to a child's estate, and the trial judge did not address this issue. It appears the judge applied the preponderance of the evidence standard normally

---

[11] The issue in N.I. was whether a trial judge erred by failing to provide the jury with a definition of "abandonment" as used in N.J.S.A. 9:6-1 where the defendant was charged with endangering the welfare of a child under N.J.S.A. 2C:24-4. N.I., supra, 349 N.J. Super. at 302-03.

applied in civil cases. See State v. Seven Thousand Dollars, 136 N.J. 233, 238 (1994).

Fisher argues that a clear and convincing evidence standard should have been used because that is the standard applied in termination of parental rights cases. See N.J. Div. of Youth & Family Servs. v A.L., 213 N.J. 1, 25 (2013). We disagree.

In a termination of parental rights case, "[t]he burden rests on the party seeking to terminate parental rights 'to demonstrate by clear and convincing evidence' that risk of 'serious and lasting [future] harm to the child' is sufficiently great as to require severance of parental ties." In re Adoption of a Child by W.P. & M.P., 308 N.J. Super. 376, 383 (App. Div. l998) (alteration in original) (quoting In re Guardianship of J.C., 129 N.J. 1, 10 (1992)). The question for the court "focuses upon what course serves the 'best interests' of the child." W.P. & M.P., supra, 308 N.J. Super. at 383.

On the other hand, in a proceeding under N.J.S.A. 3B:5-14.1, the "best interests" of the child are not at issue; the only question is whether a parent may share in the child's financial estate. Therefore, we reject Fisher's argument that the termination of parental rights standard of proof should be applied in this case.

In so ruling, we recognize that the clear and convincing evidence standard is often used to determine issues involving will contests. Thus, for example, the burden of establishing lack of testamentary capacity is on the one who contests the will being offered for probate. This "burden must be sustained by clear and convincing evidence." In re Estate of Hoover, 21 N.J. Super. 323, 325 (App. Div. 1952), certif. denied, 11 N.J. 211 (1953). We also note that a provision in the Uniform Probate Code, that has not been adopted by our Legislature, bars a parent from inheriting from their child if

> the child dies before reaching [18] years of age and there is clear and convincing evidence that immediately before the child's death the parental rights of the parent could have been terminated under law of this state other than this [code] on the basis of nonsupport, abandonment, abuse, neglect, or other actions or inactions of the parent toward the child.
>
> [Unif. Probate Code § 2-114 (amended 2010), 1 U.L.A. 118 (2013).]

However, we presume that the Legislature was aware of these precedents when it enacted N.J.S.A. 3B:5-14.1 and nevertheless chose not to specifically impose a clear and convincing evidence burden of proof. See Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 178 (2006) (noting "that the Legislature is well aware of its ability to impose a higher standard of proof when it so desires"). When, as here, the Legislature does not designate

25

the standard of proof to be applied in a civil case, it is reasonable to conclude that the "absence of an evidentiary standard indicates that a preponderance of the evidence -- the traditional, default standard -- applies." Id. at 179.

Moreover, we have determined that the Legislature intended to import the standard for determining "abandonment" that applies in cases arising under N.J.S.A. 9:6-1 into N.J.S.A. 3B:5-14.1(b)(1). It is well established that the burden of proof in abandonment cases under Title 9 is the preponderance of the evidence standard. N.J.S.A. 9:6-8.46(b)(1). That standard is therefore the most appropriate to use in cases arising under N.J.S.A. 3B:5-14.1(b)(1).

## IV.

Applying these standards to the facts of this case, we conclude that the evidence presented to the trial court did not preponderate in favor of a finding that Fisher "abandoned" his son by "willfully forsaking him." To be sure, Fisher did not take the actions necessary to enable him to have parenting time with Michael after Nees obtained the FRO against him. He did not submit to a risk assessment or counseling as ordered by the judge in the parties' divorce action. As a result, Fisher did not have parenting time with Michael for the period between the

court's January 29, 2002 order suspending visitation and the date of Michael's death in September 2010.

The judge in this case focused almost solely on these actions in determining that Fisher "abandoned" his son. The judge found that Fisher's actions "were unequivocally intentional rather than accidental or involuntary." However, that is only part of the test under N.J.S.A. 3B:5-14(b)(1). As we hold in this opinion, the issue is whether Fisher clearly manifested a settled purpose to <u>permanently</u> forego <u>all</u> parental duties and relinquish <u>all</u> parental claims to the child. That purpose was not demonstrated here.

As the judge specifically stated, "[t]he court does not question that [Fisher] cared for his son" and did not "mean to imply that it was his purpose or specific intent to abandon him." The judge subsequently observed that "it may not have been [Fisher's] specific intent or purpose to abandon his son." However, without that settled "purpose" or "specific intent," there can be no abandonment or willful forsaking of a child. <u>Lavigne</u>, <u>supra</u>, 11 <u>N.J.</u> at 480.

The judge ignored facts in the record which demonstrated that, in spite of his repeated failure to take steps to restore parenting time with his son, Fisher never acted with the settled purpose to permanently forego all of his parental duties or

relinquish all parental claims to Michael. For example, Fisher certified, without contradiction, that during the divorce proceedings, he was presented with an offer that, if he agreed to give up his rights to the child, Nees would not seek child support. Fisher rejected this offer out of hand.

The record also demonstrates that Fisher paid child support for Michael throughout the child's life. At oral argument before us, the parties estimated that Fisher's total child support obligation for the period between the parties' March 2002 divorce and the court's July 2010 order terminating the support obligation due to Fisher's extremely poor health was approximately $37,000. Although Fisher was approximately $10,000 in arrears at the time of the July 2010 order, he had still paid more than two-thirds of the total amount due.

We do not view Fisher's May 2010 motion to reduce or terminate his child support obligation as evidence of a settled purpose on his part to permanently forego all parental duties and claims to his child. Child "support orders define only the present obligations of the former spouses. Those duties are always subject to review and modification on a showing of 'changed circumstances.'" Lepis v. Lepis, 83 N.J. 139, 146 (1980).

In his motion, Fisher stated that his "support would never have stopped if not for [his] illness" and, based upon the proofs submitted, the motion judge determined that Fisher's "circumstances have changed so that the current child support order is no longer feasible." Nevertheless, Fisher remained obligated to pay the existing arrears, and he continued to do so even after Michael's death. Fisher also did not oppose Nees' motion to reinstate child support if Fisher were able to obtain Social Security Disability benefits. Under these circumstances, we are unable to conclude that Fisher intended to permanently abandon Michael when he filed this motion.

The trial judge was critical of Fisher because the child support payments were made by way of wage garnishment. The judge therefore concluded that Fisher "failed to voluntarily comply with his child support obligations . . . ." However, the preferred method of paying child support is by way of wage garnishment. N.J.S.A. 2A:17-56.8 provides that a child support order "shall be paid by income withholding unless the order . . . specifically provides for an alternative payment arrangement to which the parties agree in writing or [one of the parties] demonstrates and the court finds good cause for establishing an alternative arrangement." See also R. 5:7-4A(a). Moreover, the parties agreed in the FJOD that child

support should "be paid via income withholding through the . . . Probation Department. . . ." Thus, this is not a case where a parent has willfully withheld all support from a child.

Although Fisher did not have parenting time with Michael after 2002, he did see and speak to the child on one occasion in violation of the FRO. Fisher also made contact with his son on Facebook a few months before his death. He returned to New Jersey to attend Michael's funeral. These actions are not consistent with those of a parent whose "settled purpose" was to permanently forego all parental duties and relinquish all parental claims to his child.

Under these circumstances, we conclude that Nees did not demonstrate by a preponderance of the evidence that Fisher "abandoned" his son "by willfully forsaking" him. Therefore, the exception to intestate succession set forth in N.J.S.A. 3B:5-14.1(b)(1) should not have been invoked in this case.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0878-14T2