**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2593-17T4

IN THE MATTER OF THE
ADOPTION OF A CHILD
BY C.J.

_____

> **APPROVED FOR PUBLICATION**
>
> **October 28, 2020**
>
> **APPELLATE DIVISION**

Submitted March 18, 2020 – Remanded April 28, 2020
Argued October 1, 2020 – Decided October 28, 2020

Before Judges Fuentes, Whipple and Firko.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Gloucester County,
Docket No. FA-08-0012-17.

Tracy Julian argued the cause for appellant G.D.
(Pashman Stein Walder Hayden, PC, attorneys; Tracy
Julian, of counsel; Linda Torosian and Timothy
Malone, on the briefs).

Lynn M. Castillo, attorney for respondent C.J.

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Appellant, G.D. (Gloria),[1] appeals the January 5, 2018, judgment entered by the Chancery Division, Family Part terminating her parental rights to her daughter, G.J. (Gail), and granting adoption to C.J. (Cathy), Gail's stepmother, who is married to Gail's father, P.J. (Paul). We reverse the decision to terminate Gloria's parental rights and vacate the judgment of adoption.

Gail was born in January 2008. Her biological parents never married. Gloria was the parent of primary residence after the child's birth, while Paul had parenting time every other weekend.[2] And although early child support orders are not included, we deduce from the other orders in the record that Gloria sought child support from Paul.

According to records of the Division of Child Protection and Permanency (Division), it became involved with this family in July 2007 when it substantiated Gloria for neglecting a different child prior to Gail's birth.

Cathy first met and began caring for Gail while she was with Paul, around June 2008, when Gail was five months old. In July 2008, Paul filed an Order to Show Cause seeking emergency custody of Gail. He alleged that

---

[1] Due to the confidential nature of records pertaining to the placement of a child, we use pseudonyms in lieu of actual names. See R. 1:38-3(d)(13).

[2] The record does not reflect whether custody was arranged by the parties or by court order after an FD hearing.

Gloria failed to meet him to take custody of the child at the conclusion of a parenting time visit. Paul also asserted that the Division was "involved." At that time, the court did not remove Gail from Gloria's care. Further, in July 2008, the Division investigated allegations of Gloria's inadequate supervision of Gail but found no basis to intervene. The Division caseworker who investigated the matter noted that the couple is "separated and they are in the beginnings of a custody dispute. There is no evidence to support the allegations and there is documentation on the record that [Gloria] has been given random urine tests that have returned negative each time."

In February 2009, the Division received a referral alleging substantial risk of physical injury or environment injurious to the health and welfare of Gail. Gloria subsequently submitted diluted urine screens and was recommended for an intensive outpatient program.

In August 2009, Paul married Cathy, and one month later, according to Cathy's testimony, she and Paul contacted the Division to present photos of an incident involving Gail and Gloria. Those photos depicted the then one-year-old Gail on a boat, holding a beer bottle and appearing to be drinking, while Gloria was present. Based exclusively on this incident, the Division substantiated Gloria for neglect.

Later on, in February 2011, Paul and Cathy brought Gail to a McDonald's to return her to Gloria following Paul's parenting time. Gloria was not there to pick up Gail, but Gloria's older daughter and Gloria's boyfriend were there. Cathy testified that she and Paul gave the child to Gloria's boyfriend, called the police, and then followed Gloria's boyfriend home. Cathy testified that when she confronted the boyfriend at the house, he "had alcohol on his breath," so she took Gail back to her and Paul's house. According to Division records, Gloria filed an emergency motion with the court after Gail was not returned to her, and Paul filed an emergency motion to modify the custody arrangements.

In court on February 28, 2011, Gloria and Paul were both drug-tested; Gloria tested positive for cocaine, while Paul tested positive for methamphetamines. He then underwent another drug screen the same day, which was negative for all substances. Afterward, the Division records reflect that a safety plan was implemented, and Paul was permitted to have contact with Gail supervised by Cathy until the arrangements were lifted by a Division worker approximately two weeks later. Eventually, the court granted Paul residential custody of Gail, where she remains today. Additionally, Gloria agreed to participate in a substance abuse evaluation and received court-ordered unsupervised visitation with Gail.

In September 2011, the court ordered parenting time for Gloria on Wednesdays from 6:00–8:00 p.m. and every other Saturday from 12:00–3:00 p.m. In June 2012, the court denied Paul's application for supervision of Gloria's parenting time. The court noted in the June order that Gloria was arrested on a child support warrant that was lifted before she was released. She also tested positive for benzodiazepine and opiates, which were her prescribed medications. As a precautionary measure, the court ordered her not to drive while Gail was in the car.

Next, in March 2013, during a Division investigation of Gloria's son and his girlfriend, an allegation surfaced that Gloria was using heroin. A ten-day safety plan was put in place by the Division, which required Gloria's parenting time to be supervised. Gloria submitted to treatment, which she completed in August 2013, and the Division closed the case.

A December 23, 2014, court order states the following:

> Dad present with counsel[.] Mom present. Mom's application for a reduction in child support is withdrawn by [M]om today. Both parties['] applications to modify parenting time is granted. Mom's parenting time shall be modified to every other Saturday, [12:00–6:00 p.m.]. Pick up and drop off shall take place at the Monroe Twp[.] Police Department. The Wednesday afternoon/evening visit is now eliminated. Mom shall submit to a hair follicle test within [ten] days. Dad's application for an increase in child support is denied; however, the

[c]ourt acknowledges that Dad incurs fees for the child's daycare ($100/[week]) and medical coverage ($140/month). Parties are to share the fees 50%/50%, payable through probation. The cost is hereby added to the child support obligation and the obligation is modified to $110/[week]. . . . Request for counsel fees is granted. Mom is ordered to reimburse [father's attorney] a total of $500 within [thirty] days from today's order.

According to a subsequent May 28, 2015, court order, Gloria was found $529.57 in arrears in child support. On that day the court ordered:

Mom present. Dad present with counsel[.] Dad's application seeking strict enforcement, including two missed payment stipulation or a bench warrant shall issue is granted. His application seeking to suspend [M]om's parenting time is granted. Mom is ordered to complete a psychological evaluation by a licensed psychologist who specializes in child welfare issues. The psychologist shall be provided with the [Division] records and court orders as necessary to fully understand the dynamic of the family. Dad's application seeking reimbursement for counsel fees for today's filing is granted and [M]om is ordered to pay the total fees of $500 within [thirty] days. Failure to pay within [thirty] days will result in fees being reduced to judgment.

We have not been provided with a transcript of the May 28, 2015, court hearing. On its face, the order does not describe the factual basis for the court's decision to order Gloria to submit to a psychological evaluation. However, the record reflects an allegation arising from a February 2014 drop-off, wherein Gloria allegedly told Cathy "remember when you're kissing [Gail]

whose p**** she came out of" and "just remember when you're laying in your bed who your husband is f****** in your bed" as Gloria was "walking away with [Gail] who's covering her ears."

According to Cathy, after this visit, Gail told her that Gloria said "that her father didn't want her, that her father wanted her [mother] to go to the hospital . . . and have them cut her out of her belly and kill her because he didn't want her."  A few days after this, Gail's school guidance counselor reported that Gail had told the counselor Gloria said "that daddy made her have a baby cut out of her and that he was trying to do that to her when she was pregnant w[ith] [Gail]."  Gail was six years old at the time.

As a result of having parenting time suspended, Gloria's last physical contact with Gail was in April 2015.  Cathy filed a complaint for adoption on October 13, 2016, and Gloria filed an objection.  Regarding Gloria, the complaint alleged that she had not seen the child since April 2015; she had a long history of drug and alcohol abuse; her parenting time was suspended until she completed a psychological evaluation; she did not provide medical support even though her share of medical expenses are calculated into her child support obligations, which were in arrears; and she had a suspended driver's license.  The complaint similarly alleged Gloria had abandoned Gail pursuant to N.J.S.A. 9:6-1.

The trial court appointed a Guardian ad Litem to represent the child's interest in the matter on December 2, 2016. Counsel from the New Jersey Public Defender Office of Parental Representation was assigned to represent Gloria, after the court determined she was indigent. Gloria's counsel arranged for her to undergo a psychological evaluation to address her ability to parent Gail. But despite requests, the court denied Gloria any parenting time pending the adoption trial. Although the judge granted Gloria's application to have Gail examined by an expert, the record lacks any explanation as to why that examination apparently did not happen.

In March 2017, Ronald Gruen, EdD, completed his comprehensive psychological evaluation, including a battery of tests, ultimately concluding that "[Gloria] has personality weaknesses but no significant psychopathology which would render her unfit to parent." Dr. Gruen reported "[Gloria] was convinced that [Paul] was using the courts and [the Division] to wrest custody of their child away from her" and "[Gloria] is not interested in taking [Gail] away from her father and step-mother. . . . [S]he is basically interested in maintaining her parental rights and securing some parenting time." He noted "[Gloria] is capable of parenting her daughter if given the opportunity."

In May 2017, after reviewing Division records, Dr. Gruen issued a supplemental report, finding that the Division never considered Gloria's

parenting to be deficient enough to file a Guardianship Complaint against her: "[i]n my opinion, review of the [Division] records does not support termination of [Gloria's] parental rights to her daughter, [Gail]." On July 27, 2017, Adoptions from the Heart issued an adoption home study report recommending Cathy adopt Gail. The adoption report contained embedded hearsay provided by Cathy, again reciting the alleged comment from Gloria to Gail that "[y]our father wanted to cut you out of my belly and kill you," and reported that Gail was treated in psychotherapy due to Gloria's comments. Adoptions from the Heart conducted no independent psychological evaluation of the child and recommended that Cathy was an appropriate caregiver for Gail.

The Guardian ad Litem also issued a comprehensive report in October 2017, expressing various concerns about Gloria's sobriety and a concern that Gloria had not completed the court-ordered psychological evaluation. That report made no mention of Dr. Gruen's evaluative reports from March 2017 and May 2017, and offered the legal determination that Gloria had "forsaken her parental duties" to Gail, asserting Gloria had not maintained a relationship or communicated with her daughter since May 2015. The Guardian ad Litem's report also based its conclusion on an unsupported assertion that Gloria had not provided "any form of financial support" for Gail.

At trial, the first witness was Gail's preschool teacher, who testified generally that Cathy brings Gail to school and Gail is a good student. Paul testified about his concerns regarding Gloria's history of substance abuse and the longstanding custody dispute over Gail. He also testified regarding the photographs showing Gail holding a beer bottle on a boat. Cathy also testified about her relationship with Gail and Gail's attendance at therapy. The parties stipulated to the Adoptions from the Heart report and evidence from the Division record, exclusive of embedded hearsay. Dr. Gruen testified consistent with his written evaluation, and Gloria herself testified.

On January 5, 2018, the trial court terminated Gloria's parental rights after finding:

> [Gloria] has not fulfilled her financial obligations for the care of this child. Currently according to court records, she owes $7,271.57 in child support arrears as of December 2017. [Gloria] testified on cross-examination that she is unable to work due to injury sustained in a car accident [ten] years ago. She has applied, according to her testimony, for Social Security disability but her claim was denied. There was no proof of that admission into Social Security application. In addition to that, [Gloria] failed to submit any medical evidence to substantiate her claim for not being able to work and support the child. However, [Gloria] has testified that she currently supports herself by cleaning apartments which includes bending, lifting and scrubbing floors.

[Gloria] has not showed a continued interest in the child nor demonstrated a genuine effort to maintain communication with the child. [Gloria]'s parenting time was suspended on May 27th, 2015, pending a psychological evaluation. That was court ordered under FD-08-865-08 and that was dated as noted May 27th, 2017 [sic]. [Gloria] did not complete a psychological evaluation until March of 2017 when this -- after this litigation had been enacted.

Because of that, she has had two years of parenting time which has been suspended. The last time [Gloria] saw the child according to her was April of 2015. [Gloria] testified that she had no phone contact with the child, she has not sent letters, cards or gifts to her daughter in over two and a half years. Prior to [Gloria]'s visits being suspended, she had six hours of parenting time on Saturday every other week. That was from December 23rd, 2014, until visitation had been suspended as noted in May of 2015.

[Gloria] has not established or maintained a place of importance in the child's life. In the report that was submitted as evidence from Adoptions [f]rom the Heart, the report in numbers of places indicates the relationship or lack thereof between the child and the biological mother.

One important aspect that the [c]ourt found was that when the child was asked about her perception of her biological mother's feelings towards her, the child stated, she hasn't seen me in two and a half years. She doesn't care about me.

Although the [c]ourt has not -- has followed the best interest standard under the statute, the [c]ourt also examined standards in N.J.S.A. 30:4C for additional guidance on the best interest of the child. The factors under Title 30 are whether the child's safety, health or

11

development has been or will continue to be endangered by parental relationship, the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to that harm. A factor also considered under Title 30 is whether or not the Division has made reasonable efforts. That does not apply in this case. And, fourth, termination of parental rights will not do more harm than good.

The reasonable efforts prong is not relevant in this case. However, the other factors as noted provide additional support in the [c]ourt's consideration.

The child's safety, health or development has been or will continue to be endangered by the parental relationship because there was testimony provided by the plaintiff that [Gail], that's the child, was upset after her last visit with [Gloria] because [Gloria] told [Gail] that her father, [Paul], wanted to essentially have an abortion, to cut [Gail] from [Gloria]'s stomach. Plaintiff further testified that [Gail] reported the incident to her teacher and [Gail] is in therapy to address that trauma. The [c]ourt finds that the plaintiff's testimony is credible and finds [Gloria]'s conduct endangered the safety, health and development of [Gail].

In addition, on cross-examination [Gloria] denied making such statements to [Gail] but she also stated that it was possible [Gail] overheard [Gloria] talking to someone else and [Gloria] believed [Gail] lied about those statements. The [c]ourt finds that [Gloria]'s testimony reflects that [Gloria] would continue to endanger [Gail]'s safety, health and development.

> Pursuant to N.J.S.A. 9:3-46(a) and the aforementioned factors including case law, this [c]ourt finds by clear and convincing evidence that adoption is in the best interests of the child.
>
> In concluding the preliminary hearing pursuant to N.J.S.A. 9:3-48(c), the [c]ourt finds . . . [Gloria]'s objection to this adoption has been contravened pursuant to N.J.S.A. 9:3-46. The child is fit for adoption and the plaintiff is fit to adopt the child.

A stay was granted. This appeal followed.[3]

Our scope of review is limited in assessing the factual findings of the Family Part. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 278 (2007). We are obliged to accord deference to the trial court's sensibilities of the case based upon its opportunity to see and hear the witnesses, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and defer to the trial court's factual and credibility determinations. In re Adoption of a Child by J.D.S., 353 N.J. Super 378, 394 (App. Div. 2002). Indeed, we are precluded from disturbing "the trial court's findings unless they are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Id. (first quoting Rova Farms Resort, Inc. v. Invs. Ins.

---

[3] This is the second time this appeal has been before this court. On April 28, 2020, we sua sponte determined Gloria's appellate counsel was ineffective and adjourned the disposition of this appeal for the appointment of new counsel. In re Adoption of a Child by C.J., 463 N.J. Super. 254 (App. Div. 2020).

Co. of Am., 65 N.J. 474, 484 (1974); and then citing Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

However, a trial court's "interpretation of the law and the consequences that flow from established facts are not entitled to any special deference." State v. Pomianik, 221 N.J. 66, 80 (2015) (quoting Manalapan Realty v. Twp. Comm., 140 N.J. 366, 378 (1995)).  We note the burden of proof is with the plaintiff, not the objecting biological parent.  Santosky v. Kramer, 455 U.S. 745, 747-48 (1982).

On appeal, Gloria argues the court erred terminating her parental rights and granting adoption because the evidence did not support the finding she failed to affirmatively assume the duties of a parent.  We agree.

In In re Baby M., 109 N.J. 396, 445 (1988), our Supreme Court stated:

> the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights . . . the interests of the child are not the only interests involved when termination issues are raised.  The parent's rights, both constitutional and statutory have their own independent vitality.

Terminating parental rights implicates fundamental liberty interests that are protected by the United States Constitution.  In re Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404 (1999) (citing Santosky, 455 U.S. at 753).

The Adoption Act, N.J.S.A. 9:3-46, contemplates two distinct types of adoptions: one where a child has been placed for adoption, N.J.S.A. 9:3-46(a), and one where a child has not been placed for adoption. The two provisions have different time frames for the court to assess the objecting parent's conduct. Under N.J.S.A. 9:3-46(a), no time limit applies to assessing the objecting parent's behavior in the best interest of the child analysis when, like here, the child has not been placed for adoption. G.P.B., Jr., 161 N.J. at 411.

However, where a child is placed up for adoption, under N.J.S.A. 9:3-46(a)(2)(c), the timeframe is fixed. Therefore, because Gail was not placed for adoption, there is no statutory time limit.

N.J.S.A. 9:3-46(a) permits adoption over the objection of a biological parent under a "best interest of the child standard," and requires the court to consider whether the parent whose parental rights are targeted for termination has "affirmatively assumed the duties encompassed" in being a parent. This is not the same "best interest" standard courts utilize when terminating parental rights for purposes of adoption under N.J.S.A. 30:4C-15(c), which focuses on four different inquiries to terminate parental rights.[4] Under N.J.S.A. 9:3-46(a),

---

[4] Under Title 30, the "best interests" test requires the Division to show that:

[i]n a contest between a person who is entitled to notice pursuant to section 9 of P.L.1977, c.367 (C.9:3-45) objecting to the adoption and the prospective adoptive parent, the standard shall be the best interest of the child. The best interest of a child requires that a parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations for the birth and care of the child, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of

---

(continued)

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[In re Guardianship of Jordan, 336 N.J. Super. 270 (App. Div. 2001) (citing N.J.S.A. 30:4C-15.1).]

the establishment and maintenance of a place of importance in the child's life.

The Supreme Court, in <u>G.P.B. Jr.</u>, 161 N.J. at 404, instructed the court to first evaluate whether grounds for termination have been sufficiently established. The Court made it clear that the issue was "whether the biological parent has failed to fulfill his or her duties." <u>Id.</u> at 413; <u>see also</u> <u>In re Adoption of Children by D.</u>, 61 N.J. 89, 95 (1972).

Accordingly, the court herein based this termination, under N.J.S.A. 9:13-46(a), on a finding that Gloria did not fulfill her financial obligations toward the child because of her child support arrears at the time of trial, among other considerations. Notably, we are troubled by the court's reliance on this finding because termination of parental rights has never been an authorized enforcement tool—even in egregious cases involving child support arrears.

To be sure, the obligation of a parent to provide support is considered to be independent of the parent's right to parenting time. <u>Wagner v. Wagner</u>, 165 N.J. Super. 553, 556 (App. Div. 1979); <u>see also</u> <u>Fiore v. Fiore</u>, 49 N.J. Super. 219, 225-27 (App. Div. 1958) (citing <u>Bruguier v. Bruguier</u>, 12 N.J. Super. 350, 354 (Ch. Div. 1951)) (overturning an order that abated child support payments if mother or her family interfered with the father's visitation rights and stating that the "duty of a father to support his children and the right of a father to

visitation and overnight custody are not dependent upon or connected with each other"); Ryan v. Ryan, 246 N.J. Super. 376, 383-84 (Ch. Div. 1990) (citing Fiore, 49 N.J. Super. at 227) (concluding that the court was not bound by an agreement whereby the father gave up his visitation rights in exchange for being relieved of his support obligations and stating that "[i]n the best interests of the child, support and the right of visitation cannot be dependent upon or connected with each other.").

Ordinarily, only economic sanctions or compulsive incarceration, following due process procedural protections, are imposed upon a parent who violates an order respecting custody or parenting time under Rule 5:3-7(a)(2). Considering this bedrock principle, it would be anathema to suggest the failure to fulfill financial obligations for the birth and care of the child under N.J.S.A. 9:13-46(a) can be based simply on insufficient financial resources. We hold such a finding requires reliable proof of intentional abandonment of financial obligations.

Pertinently, N.J.S.A. 9:3-46(a)'s best interest analysis requires consideration of whether the objecting parent assumed "the fulfillment of financial obligations for the birth and care of the child." And although abandonment of financial obligations is not the language of N.J.S.A. 9:3-46(a), our courts have examined abandonment of parental function in other contexts,

such as requiring an intent or willfulness that is not evident in the present case. We have said before that abandonment does not mean "that the parent has deserted the child, or even ceased to feel any concern for [his or her] interests." In re Estate of Fisher, 443 N.J. Super. 180, 197 (App. Div. 2015) (first quoting Lavigne v. Family & Children's Soc'y, 11 N.J. 473, 480 (1953); and then quoting Winans v. Luppie, 47 N.J. Eq. 302, 304 (E. & A. 1890)). We have defined abandonment as "conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." Lavigne, 11 N.J. at 480 (quoting Winans, 47 N.J. Eq. at 304). We defined the term "forsaking" in the child abandonment context "as a permanent giving up or relinquishment of the child." State v. N.I., 349 N.J. Super. 299, 312 (App. Div. 2002). Our focus has always been on willful, intentional or purposeful, as distinguished from inadvertent or accidental conduct. For example, we said a parent can be found to have abandoned a child, thus losing the right to intestate succession, by "willfully forsaking" the child. Fisher, 443 N.J. Super. at 192. A parent's failure to fulfill financial obligations must therefore be intentional, evincing an intent to forgo that obligation. See id. at 200.

Here, the trial court found Gloria did not fulfill her financial obligation for Gail's care because she owed child support arrears, in the amount of

$7,271.57, and that she was voluntarily unemployed due to her inability to work, as a result of her injuries. Our review of the record indicates that although Gloria accrued child support arrears, she actually paid child support. Thus, the court erred when it found that Gloria did not fulfill her financial obligations for Gail's care. And further, the record does not support a finding that Gloria intentionally avoided paying child support.

We also reject the court's conclusion that Gloria was voluntarily unemployed. Without explanation, the court dismissed her unrebutted testimony that injuries from two motor vehicle accidents have rendered her unable to work and that she is currently unemployed. Division records and prior court orders provided some support for Gloria's claim she legitimately used prescription medications for her pain management. But the court was critical of Gloria's lack of proof that she applied for Social Security benefits and that she did not provide medical evidence beyond her testimony regarding her not being able to work as she had in the past. She testified that she currently supports herself by cleaning apartments in exchange for housing from a family member.

If this had been Gloria's motion for modification of child support, indeed, we might agree with the trial judge's criticism. However, the United States Constitution requires a plaintiff to assume a specific burden of proof to

terminate a defendant's parental rights. For example, in <u>Santosky</u>, the United States Supreme Court warned "at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutionally intolerable." <u>Santosky</u>, 455 U.S. at 768. The fact that these are private parties does not change that. The burden, by clear and convincing evidence, of proving Gloria's intentional inability to pay remained with Cathy and was not met.

The trial court also found Gloria did not show a continued interest in Gail, nor demonstrated a genuine effort to maintain communication with her. But this result was unavoidable for Gloria, as the court suspended her parenting time on May 27, 2015, pending a psychological evaluation that she did not complete until March 2017. Notwithstanding a desire to do so, it was not Gloria's choice not to see her child, and she testified the waiting period was a consequence of insufficient resources. Therefore, to use the court's barrier as a basis to find a failure to express continued interest is impermissible.

Prior to the suspension, Gloria had parenting time every other Saturday from December 23, 2014, until May of 2015. From September 21, 2011, through December 23, 2014, she had parenting time as per the September 16, 2011, order: every Wednesday from 6:00–8:00 p.m. and every other Saturday

from 12:00–3:00 p.m. Prior to September 2011, Gail resided primarily with Gloria. The court ignored the ongoing custody dispute with Paul and the motions she filed to enforce her right to exercise parenting time and requests for assistance of the police.

Moreover, Gail had no phone for Gloria to call directly. And Gloria testified she did not send letters or cards or gifts in over two years due to Paul's history of throwing away items she gave Gail during parenting time and his refusal to let Gail come to the phone when she called. The trial court also ignored Gloria's testimony that the reasons she had not completed the required $700 psychological evaluation were financial, and ignored testimony about her attempt to see Gail outside of her daycare center after the court's May 27, 2015, order. Furthermore, upon completion of the psychological evaluation, Gloria made requests to reinstate her parenting time, which the trial court denied. The trial court also made no mention whatsoever of Dr. Gruen's testimony and expert report.

In termination of parental rights proceedings for contested private adoptions, trial courts should consider "whether the custodial parent has contributed to that inability by blocking the objecting parent's access to the child." G.P.B., Jr., 161 N.J. at 412. The trial court here made no factual findings as to whether Paul blocked Gloria's access to the child despite Gloria's

testimony that she believed he would. Dr. Gruen's report confirms Gloria believed this, and there are references throughout the record that plausibly supported her assertion. It was impermissibly erroneous to rely—without further inquiry—on the Guardian ad Litem's report that Gloria failed to maintain a relationship with Gail.

Based on our review of the record, the evidence does not support that Gloria failed to show a continued interest in Gail and failed to demonstrate a genuine effort to maintain communication with Gail under the clear and convincing standard.

We also reject the use of hearsay evidence to support the termination of Gloria's parental rights. In this case, the trial court erroneously made findings based on hearsay statements within the Adoptions from the Heart report, which the court found "indicates the relationship or lack thereof between the child and the biological mother." Specifically, the court relied on a portion of the adoption agency's report that stated "when the child was asked about her perception of her biological mother's feelings towards her, the child stated, she hasn't seen me in two and a half years. She doesn't care about me."

It was also error for the court to import the test from N.J.S.A. 30:4C-15 for additional guidance on the best interest of the child. And it was further error to then make findings based upon Cathy's uncorroborated hearsay

testimony that Gloria told Gail that Paul essentially wanted to have an abortion, to cut Gail from Gloria's stomach. In particular, this Title 30 standard does not apply to a private action where a party is seeking adoption over parental objection.

These are certainly disturbing remarks, which is precisely why we require certain indicia of reliability before making a determination of trustworthiness. It should be emphasized that the child did not testify at trial, and the record includes no independent psychological evaluation of the child.

As a result of the foregoing, it was error for the trial court to find clear and convincing evidence to terminate Gloria's parental rights to Gail, and consequently, that it was in the child's best interest to grant the adoption to Cathy.

Reversed and vacated.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION