JOE B. LAVIGNE AND LOUISE P. LAVIGNE, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. THE FAMILY AND CHILDREN'S SOCIETY OF ELIZABETH, DEFENDANT-APPELLANT, AND HENRY C. TORREY AND HELEN H. TORREY, DEFENDANTS-INTERVENORS.

Argued December 8 and 15, 1952—Decided February 24, 1953.

*Mr. Alan V. Lowenstein* argued the cause for the appellant (*Messrs. Riker, Emery & Danzig,* attorneys).

*Mr. Donald G. Davis* argued the cause for the plaintiffs-respondents.

*Mr. Russell E. Watson* argued the cause for the defendants-intervenors (*Messrs. R. E. & A. D. Watson,* attorneys).

The opinion of the court was delivered by

VANDERBILT, C. J. This proceeding, in the nature of an application for a writ of *habeas corpus,* was brought by the plaintiffs to regain custody of their daughter whom they had

placed for adoption with the defendant Society. The Chancery Division of the Superior Court granted the relief sought and ordered that the custody of the child be returned to the plaintiffs. The defendant appealed from this judgment to the Appellate Division of the Superior Court, where the judgment of the Chancery Division was affirmed. The defendant thereafter petitioned the Appellate Division for a rehearing, or in the alternative, that the case be remanded to the Chancery Division for the taking of additional testimony with respect to the status of the adoptive parents, the court in its opinion having indicated that such evidence might be of some concern. At the same time the adoptive parents petitioned the Appellate Division for leave to intervene. Both the petition for rehearing and the petition to intervene were denied by the Appellate Division. The defendant then sought certification here, which was granted, as was a motion of the adoptive parents to intervene. The intervenors' motion to remand the case for taking further testimony before the hearing of the appeal was denied.

I.

Diane, the child concerned in these proceedings, was born on March 5, 1949, while her father, the plaintiff Joe B. Lavigne, was an undergraduate at the University of California. After his graduation the Lavignes moved to Roselle, New Jersey, in June, 1949, when he obtained employment as a chemist in a nearby plant. During the summer of 1949 he became subject to severe emotional disturbances due to a variety of causes—the presence of the child in the home, his wife's poor health resulting from the birth of the child, his difficulty in finding a suitable place to live, and his own hay fever.

On September 26, 1949 the Lavignes took the child, then nearly seven months old, to the defendant Family and Children's Society of Elizabeth, to discuss their problem. Interviews with case workers of the Society took place about once a week over the course of a month. At these interviews the

representatives of the Society explored the possibilities of keeping the family together, but both parents were insistent that the child be placed in a foster home as soon as possible. In the first interview Lavigne said that "he could not stand the child," that "she is a damn nuisance," that "he did not feel he could ever accept or want any children and that the only thing he could see was to get her out of the home, and to get her adopted." In a later interview he stated that "he became very angry with her not only when she made crying noises and unpleasant noises, but also when she gurgled and made cheerful noises." It was made clear to the case workers that the reason the parents wished to place their child was not financial, but rather because of the stress and strain that the presence of the baby created for the father.

On October 21, 1949 the Society agreed to place Diane in a temporary foster home where she remained until May 26, 1950. During this period of seven months the case workers of the Society interviewed Mr. and Mrs. Lavigne at least twice a month, but the parents visited the child only twice and displayed almost no interest in her welfare, declining to take her back for Thanksgiving or the Christmas holidays and failing to send her any toys or other presents. In one interview shortly before Christmas it was brought out that they had left Diane's name off all their Christmas cards except those sent to people whom they felt would notice the absence. They did not ask to take the child for Christmas, Mrs. Lavigne testified, "because again there was the problem of bringing her back, which wasn't convenient for everyone."

In May 1950 the foster parents were leaving on a trip and could no longer care for Diane, so the Society returned her to her parents on May 26, 1950. The Society had to provide a crib and play pen for her because the Lavignes, in acquiring additional furniture, had made no provision for her needs. Lavigne persisted in his desire to place Diane for adoption and Mrs. Lavigne agreed. Diane was returned to the Society on July 31, 1950, when the Lavignes executed a formal surrender and consent to her adoption:

"SURRENDER

This is to certify that I, Louise Lavigne, being the mother, and Joe Lavigne, being the father of the female child, Diane Lavigne, born March 5, 1949 in Berkeley, California, do hereby voluntarily surrender and entrust said child to the Family and Children's Society of Elizabeth, Union County, New Jersey, from this date forever. I do hereby give and authorize said Society to use and have full power and control of said child and to make and sign all necessary papers for the future care and keeping and maintenance, education and adoption of said child. I promise not to interfere or encourage or allow anyone else to interfere with plans made by said Society for the said child.

(signed) Louise Lavigne
Joe Lavigne."

This instrument was formally acknowledged by the plaintiffs.

The representatives of the Society testified that they explained their views of the irrevocable effect of the instrument the Lavignes were signing. At the trial 14 months later Lavigne testified that he thought that he might be able to regain the custody of the child even after executing the surrender. On the other hand, he also testified, "No, we were not told that we could take the child back," and that he had told his mother of their intention to give up Diane before he signed the surrender. His own psychiatrist testified, "they said they signed the paper and finally decided to give the child away for adoption because it seemed Mr. Lavigne was unable to cope with the situation and rejected the child in the beginning and was so disturbed by the presence of the child." Likewise Mrs. Lavigne testified that Mrs. Reiner, a social worker of the defendant Society "read the paper out loud and explained that it was irrevocable or that it was a strong bond." Mrs. Reiner was even more clear: "I took the opportunity to point out that surrender was as final as death, that it was the end and it broke the tie completely and forever. That was clearly understood that morning." There can be no doubt that in fact the Lavignes understood fully the nature of their act in signing the surrender and that it was in fact the consummation of a purpose determined upon by them months before.

The defendant Society is licensed by the Department of Institutions and Agencies of this State for the purpose of making suitable adoption. It sought out a suitable home for Diane, then a year and a half old, and ultimately placed her for adoption in August 1950 with Professor and Mrs. Henry C. Torrey, of Highland Park, who have a boy nine years old.

In April 1951 Lavigne called at the office of the Society and requested that the child be returned to him. He was informed that the surrender of Diane to the Society was irrevocable. He then consulted the Legal Aid Society of Union County, where he was referred by it to his present counsel, and the action now under review was instituted in June 1951.

At the trial the Society presented the testimony of its two case workers. Each stated that in their first interviews with the parents Lavigne wished to place the child for permanent adoption while Mrs. Lavigne was more inclined to a temporary removal of the child from the house. After the child had been placed temporarily with the foster parents, however, it became obvious that Mrs. Lavigne did not miss the child, felt no maternal instincts toward it, and chose to keep her husband in preference to her child. The plaintiffs now reside in California, where Lavigne has a teaching position from which he has a sufficient income to support his wife and child. They have saved $775 in order to repay the Society for its expenses in connection with the child. Both admitted that they had made a great mistake and insisted that they were quite capable now of providing the child with a suitable home. The psychiatrist appearing for them testified that Lavigne was now well adjusted, sincere and required no treatment though he had "suffered from what we call a mild or moderately severe character neurosis," but the "danger of a relapse is not too serious." On the other hand, the defendant's psychiatrist testified that the father was "either psychotic or suffering from a deep-seated character neurosis" and that it was "extremely unlikely" that he has been cured. He considered it unsafe and unfair to the child to return

her to the plaintiffs; "What is risked is a disaster for the child." The plaintiffs do not dispute the fitness of the adoptive parents or their capacity or desire to care for Diane. When it was suggested at the oral argument that it might be desirable to remand the case to the trial court for taking testimony as to the conditions under which Diane was living with the Torreys so that the court would be in a better position to judge what would be best for Diane, the plaintiffs took the position that this would be useless as the Torreys were good people and were giving Diane a good home. The Torreys did not seek to intervene in the trial court, not because of any lack of interest in the matter but because the defendant Society requested them not to do so but to leave the defense to it, it being the policy of the Society, for the good of the child, not to let the natural parents know who the adoptive parents were.

## II.

██ It has long been the settled law in the court of last resort in this State that in dealing with the custody and upbringing of an infant the welfare of the child is the controlling consideration, even going to the extent of consulting the wishes of the child if of proper age:

"The relation of parent and child is regarded as not fully characterized by the relative duties of service and support. Nature's provision of mutual affection commonly exists as the incentive to parental and filial duty and the bond of family union. *It is the instinct of childhood to attach itself and cling to those who perform toward it the parental office; and they become endeared to it by ministering to its dependence. A parent, by transplanting his offspring into another family and surrendering all care of it for so long a time that its interest and affections all attach to the adopted home, may thereby seriously impair his right to have back its custody by judicial decree. In a controversy over its possession, its welfare will be the paramount consideration in controlling the discretion of the court.* The strict right of the parent will be passed by, if a judgment in observance of such right would substitute a worse for a better custodian. \* \* \* The decree below, as it seems to me, regards nothing but the strict legal right of the parent, discarding as immaterial the circumstances which brought the subject of the writ into the appellant's family, and

caused it to be kept and cared for from its birth until the issuing of this writ. Consideration should have been given to the fact that all it knew of home or family ties grew up with the parental care bestowed upon it by the appellant and his wife. The difference in the homes of the litigants, with the child's better prospect in life with its uncle and aunt, who have both the ability and the will to advance it, should have had weight in the decision." *Richards v. Collins*, 45 N. J. Eq. 283, 287 (E. & A. 1889) (Emphasis supplied).

See also *In re A. B. M.*, 132 N. J. Eq. 434, 441 (E. & A. 1942) :

"Our law is clear on the subject. It is not the parental right but the interest of the child which is controlling. *Richards v. Collins*, 45 N. J. Eq. 283, 287."

█ Before applying this salutary principle of law to the facts in the case before us we must note that the actions of the plaintiffs constitute an abandonment of their child under R. S. 9 :6–1 :

"Abandonment of a child shall consist in any of the following acts by any one having the custody or control of the child : (a) willfully forsaking a child ; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection ; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child caring societies or private persons not legally chargeable with its or their care, custody and control."

The statute has been construed, in addition to the two cases hereinbefore quoted, in *Winans v. Luppie*, 47 N. J. Eq. 302, 304 (E & A. 1890) where a unanimous court held :

"The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties, than does the signature of the parent, which a mere impulse

may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned."

See also *Wood v. Wood*, 77 *N. J. Eq.* 593, 598 (*E. & A.* 1910), where a unanimous court reversed the Prerogative Court and affirmed the Orphans Court in holding (at *p.* 598) :

"While there has been .no actual abandonment, *i. e.*, desertion, of the child by its mother, there has been such conduct on the part of the mother as amounts to an abandonment within the meaning of that word as used in the statute."

We must next consider a factor not involved in any of the earlier authorities quoted—the significance to be attached to the "surrender" of the child by the plaintiffs to the defendant Society. The surrender is not merely strong evidence showing an abandonment, but it is ordinarily (see *N. J. S. A.* 9 :2–9 and 11 for extraordinary situations) a necessary prerequisite to the Society's consenting to an adoption under *R. S.* 9 :3–4:

"A written consent, acknowledged or proved in the manner required by law for deeds to real estate, shall be presented to the court with the petition for adoption, such consent to be obtained from :
a. The child sought to be adopted if above the age of fourteen years, and, in any event, the consent of
b. The parents of the child ; or
\* \* \* \* \* \* \* \* \* \* \* \*
f. Any orphanage or children's home or society incorporated under the laws of this State to care for children, \* \* \* *which has acquired the custody and control of the child, by grant of the parents for the full term of minority* or by other legal means. \* \* \*"
(Emphasis supplied).

The statute embodies a sound public policy. There are many advantages to society in having adoptions arranged through unselfish, experienced nonprofit associations rather than by private individuals who lack skill in this delicate work and who may have personal motives other than the best interest of the child. If societies such as the defendant are to function under the statute, they must be in a position to plan for the child without interference, in the absence of any unfair dealing or poor judgment adversely affecting the custody of the infant. Their situation is quite different from that existing in private adoptions; see *In re Schult*, 14 *N. J. Super.* 587 (*Cty. Ct.* 1951), which was governed by section (b) of the statute instead of (f) as in the present case. The significance of authorized agencies such as the defendant Society may be better appreciated when we note that according to statistics, furnished by the Department of Institutions and Agencies, of the 1,726 adoptions in this State in 1951, 585 were accomplished through such authorized agencies. Such a surrender as was authorized here by the plaintiffs does not, of course, relieve the natural parents from their common law duties until an adoption has been ordered in appropriate court proceedings, but it does preclude the natural parents from interfering with the work of authorized agencies except in the circumstances heretofore indicated.

The facts in the case show clearly that there has been an abandonment of the infant under the terms of the statute. The abandonment was made manifest, not merely by the formal, acknowledged surrender of the child by the plaintiffs to the defendant Society, but by the conduct of the plaintiffs throughout their dealings with the Society. The surrender of the child was accepted by the Society only after prolonged efforts on its part to keep the plaintiffs' family together. There is not the slightest suggestion of unfair dealing or of poor judgment adversely affecting the infant. The solemn nature of the surrender was fully explained to the plaintiffs. Finally, but most important of all, the best interests of the infant will obviously be served by her remaining in the home

of the intervenors, where she has been for the past 2½ years. On the entire case we cannot escape the conclusion that the welfare of the child dictates that she should not be subjected to the risks that a change of custody would involve.

It is urged that we should follow the "two court rule" enunciated in *Midler v. Heinowitz*, 10 *N. J.* 123 (1952), but manifestly the rule has no application here in the light of our conclusions as to the law of the case or in view of the fact that the welfare of the infant is paramount and controlling.

The judgment of the Appellate Division of the Superior Court is reversed and a judgment will be entered here denying the application for a writ.

WACHENFELD, J. (dissenting). Altering nature's pattern under any circumstances is usually precarious. To take away from the natural parents their own flesh and blood and donate that bit of humanity to others cannot be lightly undertaken. The natural law precedes our man-made code and should not be contravened unless the emergency is clear and unmistakable. The slightest doubt should be resolved on the side where one almost instinctively expects to find it.

The uncertainties of life, the emotional disturbances, the mental strains and pressures, the valleys and the heights, will always remain to be encountered as long as one lives and pursues life's pathway. Their devious forms and variations are too complicated and numerous to be susceptible of tabulation. Our inability to predict or solve them anchors us closely to nature's intendment, with the fervent prayer we will find a guide to take us on our journey, thankful for and recompensed by the joys we recall while striving to forget the shadows and the sorrows we must silently endure.

A judicial approach does not make the future more readily foreseeable and the assurance of our decision, whatever it be, is unfortunately circumscribed by the frailties of human judgment.

I doubt its proof, but assuming abandonment, it, together with the surrender agreement, does not possess a legal finality precluding our courts from considering and determining its rescission and the restoring of the custody of the infant to the natural parents so long as it is for the best interests of the child.

There is no law or legislative mandate, prior to adoption, forever closing the door to recapture by parents whose responsibility and parental instincts are reawakened and normalized by the impact of physical separation. The natural parents of a child are entitled, against all the world, to its custody, and only the primary consideration of the child's welfare has priority over this frequently-expressed doctrine. Abandonment, even though it occur, can be repented of and, subject to the child's best interests, parental rights and custody can be again acquired.

Even governments by sovereign *fiat* attempted to wrench youth from parent, endeavoring to enhance their worth for imperialistic objectives by intensifying and supplying special education and training. Eventual realization of the underlying fundamental error brought about the plan's complete revocation. The failure of this endeavor supplies additional evidence that the natural family is still the real unit and the foundation of society.

Here the child was 16 months of age when surrendered to the Society. She was in custody of the adopting parents about 8½ months and was two years and three months old at the time of the institution of this suit. This factual situation does not lend itself to the thought that the restoration of the custody to her natural parents would impair or jeopardize the child's best interests. In fact, the contrary seems more probable.

This cause has already received the meticulous consideration of five different judges, most of whom have recorded their reasons supporting the natural parents' claims. I have attempted, contrary to the usual procedure, to give no consideration to them in coming to my own independent con-

clusion, but nevertheless find myself in accord with their views.

I would affirm the judgment below.

HEHER, J., joins in this dissent.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING and BRENNAN—4.

*For affirmance*—Justices HEHER and WACHENFELD—2.