RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0061-16T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

A.B.J. and T.E.,

 Defendants,

and

D.B., SR.,

 Defendant-Appellant.

____________________________

IN THE MATTER OF D.B. and
T.E., minors.

____________________________

 Submitted October 5, 2017 – Decided November 17, 2017

 Before Judges Rothstadt and Gooden Brown.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Camden County,
 Docket No. FN-04-0200-16.
 Joseph E. Krakora, Public Defender, attorney
 for appellant (Beth Anne Hahn, Designated
 Counsel, on the briefs).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa H. Raksa,
 Assistant Attorney General, of counsel;
 Stephanie Kozic, Deputy Attorney General, on
 the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minors (David Valentin,
 Assistant Deputy Public Defender, on the
 brief).

PER CURIAM

 In this Title 9 matter, defendant D.B.1 appeals from the

Family Part's July 26, 2016 order memorializing the court's

determination that he abused or neglected his son, D.B. Jr.

("David") by abandoning the child as contemplated by N.J.S.A. 9:6-

8.21(c)(5). On appeal, defendant argues that the weight of the

evidence did not support the court's finding because he did not

forsake his parental responsibilities, and the deterioration of

his relationship with his son was merely an unintended consequence

of his financial instability. He also argues that plaintiff, the

New Jersey Division of Child Protection and Permanency (Division),

"failed to make reasonable efforts to prevent placement and . . .

to reunify [defendant] with his son or otherwise preserve the

father-son relationship." We disagree and affirm.

1
 We use initials and pseudonyms to protect the family's privacy.

 2 A-0061-16T2
 The salient facts developed at the fact-finding hearing are

summarized as follows. Defendant, David's mother (Alice),2 David

and his ten-year-old sister Debbie lived together as an intact

family until early 2013. At the time, David was fifteen years

old, and attending high school. Alice provided a major part of

the family's income until she decided that year to leave to live

with a different man.

 Soon after Alice left, defendant began to experience

financial hardships. Eventually, David's sister went to live with

her maternal grandmother while David remained with defendant in

the home. Defendant however would leave David alone for days

without supervision or provisions. Defendant began to abuse

alcohol, and each day he became less able to respond to David's

basic needs.

 In early 2014, the power to defendant's home was turned off,

which forced David to seek shelter elsewhere. In the spring,

David chose to move in with his friend and his friend's mother

(Betty), instead of living with defendant at a relative's home.

David believed that this would be a temporary arrangement, but

after he began to lose contact with defendant, he returned to

their home in September only to find it padlocked. David was

2
 David's mother, defendant A.B.J., did not join defendant in
his appeal of the Family Part's decision.

 3 A-0061-16T2
never able to return home. He remained with Betty who provided

for all of his needs.

 Initially, defendant maintained some contact with David while

his son stayed with Betty. He attended some of his son's football

games and appeared on David's prom night. However, defendant

never attempted to speak to Betty or to make any arrangement or

contribution for David's care. When it became apparent that

defendant was not going to care for David, Betty contacted the

Division, which initially responded that it would remove David

from her care, a result Betty was not seeking.

 Later, to keep David enrolled in school, Betty needed

defendant to sign an affidavit confirming the family's

homelessness. When she spoke to defendant, Betty encouraged him

to come to her home to spend time with David. Defendant chose not

to visit his son although he lived nearby.

 The next year, Betty became concerned about David's medical

insurance. Eventually, it became apparent that in order for David

to have health insurance, the Division would have to get involved.

Betty knew the Division would not approve her as a caretaker for

David because the father of her two youngest children had a

criminal record. She asked another woman (Jean), whose son was

also David's friend, to become David's caretaker and Jean agreed.

 4 A-0061-16T2
 While transitioning from Betty's home to Jean's, David became

ill, and needed defendant, who was still his legal guardian, to

accompany him to a local medical facility. Betty and Jean located

defendant and he accompanied them to the local urgent care

facility. Defendant never made any inquiry as to the status of

either family's care for his son or his living arrangements.

 In July 2015, Jean notified the Division that David was living

with her. A caseworker interviewed David. During the interview,

David stated that he had no relationship with defendant. The

Division instituted the underlying action, and obtained an order

awarding it custody of David and permitting him to continue living

with Jean. David lived with Jean but also spent time at Betty's

home. He came to consider them as his "two mothers."

 At the ensuing fact-finding hearing, Judge Angelo J.

DiCamillo heard testimony from the Division's caseworker, Betty,

Jean, David, and defendant. David and defendant testified as to

the nature of their relationship and its deterioration, which led

to David's placement.

 David testified that, although technically his parents had

abandoned him, he knew they could not care for him "even if they

wanted to." He explained that it was his decision to move in with

Betty after defendant was evicted. He also reported turning down

defendant's invitation to stay with him at a family member's home

 5 A-0061-16T2
because he "felt like it was[ not] the best decision for [him]."

He preferred the stability of living with his friends' families.

 David also lamented the loss of his relationship with

defendant, which he once described as close. He mentioned that

he resented hearing other family members talk about spending time

with defendant, who lived nearby but never came to visit David.

"[I]t bothered [him] that [defendant] never tried to look for

[him.]" Notwithstanding defendant's lack of effort, David stated

that he had "tried to build a relationship" because he "want[ed]

a relationship with [his] dad again." At times, David wished that

he could have conversations with defendant, but hesitated to call

him because defendant was the parent in the relationship, not the

other way around.

 Defendant denied abandoning David. According to defendant,

he loved his son, and he attempted to maintain contact with him

and attend his football games, but their separation placed

inevitable strain on their relationship. He admitted he did not

contact Betty or Jean about David, but claimed he knew that his

son was in good hands and would not "get[] in trouble" living with

them.

 After considering the testimony, and the provisions of

N.J.S.A. 9:6-8.21(c)(5), Judge DiCamillo concluded defendant had

abused or neglected David by abandoning him. He found that

 6 A-0061-16T2
defendant had willfully forsaken his son when he failed to maintain

a relationship with him. According to the judge, defendant's

poverty did not excuse his failure to "act[] as a father" to David.

Defendant could have "walked [to the house where David lived] once

a week to see [his son]. He could have developed a relationship."

Instead, defendant ignored his "responsibility to be a father to

[his son]," by not "reach[ing] out . . ., visit[ing] the child,

talk[ing] to him, [or] see[ing] what[ is] going on." Judge

DiCamillo determined, in doing so, defendant had willfully

forsaken his parental duties to David, which constituted

abandonment.3 This appeal followed.

 We begin our review by recognizing it is limited and narrow.

In recognition of the special expertise of Family Part judges in

matters of parental abuse and neglect, we defer to findings

supported by "substantial credible evidence in the record." N.J.

Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010).

We intervene, however, to ensure fairness if the judge's

"conclusions are 'clearly mistaken or wide of the mark.'" Id. at

227 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J.

88, 104 (2008)). "Where the issue to be decided is an 'alleged

3
 The court, sua sponte, also found that the Division "dropp[ed]
the ball" by "fail[ing] to help this child out" when Betty called
in 2014.

 7 A-0061-16T2
error in the trial judge's evaluation of the underlying facts and

the implications to be drawn therefrom,' we expand the scope of

our review." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J.

596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J.

Super. 172, 188-89 (App. Div. 1993)). The trial judge's

interpretation of the law and the application of such legal

conclusions to the facts are subject to plenary review. See

Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366,

378 (1995). In our review, we consider the totality of the

circumstances in abuse or neglect proceedings. N.J. Div. of Youth

& Family Servs. v. P.W.R., 205 N.J. 17, 39 (2011).

 "New Jersey's child-welfare laws balance a parent's right to

raise a child against 'the State's parens patriae responsibility

to protect the welfare of children.'" N.J. Div. of Child Prot. &

Permanency v. Y.N., 220 N.J. 165, 178 (2014) (quoting N.J. Dep't

of Children & Families v. A.L., 213 N.J. 1, 17-18 (2013)). "The

adjudication of abuse or neglect is governed by Title 9, which is

designed to protect children who suffer serious injury inflicted

by other than accidental means." N.J. Div. of Youth & Family

Servs. v. S.I., 437 N.J. Super. 142, 152 (App. Div. 2014) (citing

G.S. v. Dep't of Human Servs., 157 N.J. 161, 171 (1999)); see also

N.J.S.A. 9:6-8.21 to -8.73. Title 9 is intended to safeguard

 8 A-0061-16T2
children who have been abused or are at risk of imminent harm.

A.L., supra, 213 N.J. at 18, 22.

 "Strict adherence to the statutory standards . . . is

important because the stakes are high for all parties concerned."

Y.N., supra, 220 N.J. at 179. Consequently, whether a parent has

engaged in acts of abuse or neglect is considered on a case-by-

case basis and must be "analyzed in light of the dangers and risks

associated with the situation," N.J. Dep't of Children & Families

v. R.R., 436 N.J. Super. 53, 58 (App. Div. 2014) (quoting G.S.,

supra, 157 N.J. at 181-82), and evaluated "at the time of the

event that triggered the Division's intervention." N.J. Dep't of

Children & Families v. E.D.-O., 223 N.J. 166, 170 (2015).

 Under Title 9, a child is "abused or neglected" when a child

"has been willfully abandoned by his parent or guardian." N.J.S.A.

9:6-8.21(c)(5). A parent or guardian willfully abandons a child

by committing any of the following acts:

 (a) [W]illfully forsaking a child; (b) failing
 to care for and keep the control and custody
 of a child so that the child shall be exposed
 to physical or moral risk without proper and
 sufficient protection; (c) failing to care for
 and keep the control and custody of a child
 so that the child shall be liable to be
 supported and maintained at the expense of the
 public, or by child caring societies or
 private persons not legally chargeable with
 its or their care, custody and control.

 [N.J.S.A. 9:6-1 (emphasis added).]

 9 A-0061-16T2
In addition:

 [A]bandonment does not necessarily . . . imply that
 the parent has deserted the child, or even ceased
 to feel any concern for [the child’s] interests.
 It fairly may . . . import any conduct on the part
 of the parent which evinces a settled purpose to
 forego all parental duties and relinquish all
 parental claims to the child.

 [Lavigne v. Family & Children's Soc'y, 11 N.J. 473,
 480 (1953) (emphasis added) (quoting Winans v.
 Luppie, 47 N.J. Eq. 302, 304 (Ct. Err. & App.
 1890)).]

 "Abandonment requires a finding that parents, although

physically and financially able to care for their children,

willfully forsook their parental responsibilities. The concept

of abandonment entails a willful surrender or intentional

abdication of parental rights and duties." In re Guardianship of

K.L.F., 129 N.J. 32, 39 (1992) (citations omitted). "The word

'willfully' in the context of this statute means intentionally or

purposely as distinguished from inadvertently or accidentally."

State v. Burden, 126 N.J. Super. 424, 427 (App. Div.), certif.

denied, 65 N.J. 282 (1974).

 A parent's lack of income cannot be relied upon as the sole

basis for a finding of abandonment. Poverty is insufficient to

support a finding of child abuse or neglect. N.J. Div. of Child

Prot. & Permanency v. L.W., 435 N.J. Super. 189, 195 (App. Div.

 10 A-0061-16T2
2014) (citing Doe v. G.D., 146 N.J. Super. 419, 430-31 (App. Div.

1976)). The question to be answered is whether the parent did all

that was possible to provide for his or her child's material and

emotional support given the circumstances. See, e.g., L.W., 435

N.J. Super. at 196 (reversing a finding of abuse or neglect where

an impoverished mother "did the responsible thing" by seeking

"housing through government agencies[, seeking] employment to no

avail [and] coming to the Division for help instead of subjecting

her children to further homelessness"); see also In re Guardianship

of J.C., 129 N.J. 1, 11 (1992) (reversing a termination of parental

rights where a mother continued to demonstrate support for her

children after their placement in foster care by "show[ing] an

interest in her children . . . visiting them regularly and

frequently").

 At a fact-finding hearing, N.J.S.A. 9:6-8.44, the burden is

on the Division to prove by a preponderance of the "competent,

material and relevant evidence," N.J.S.A. 9:6-8.46(b)(2), that the

parent failed to provide support and care. P.W.R., supra, 205

N.J. at 32. In assessing the proofs, we focus "on the harm to the

child." G.S., supra, 157 N.J. at 180. We observe that the conduct

of a parent or guardian is assessed "in context based on the risks

posed by the situation." N.J. Dep't of Children & Families v.

T.B., 207 N.J. 294, 309 (2011).

 11 A-0061-16T2
 Applying these guiding principles, we conclude that Judge

DiCamillo's finding of abuse or neglect was supported by

substantial credible evidence. Defendant's arguments challenging

the judge's finding of abandonment are without sufficient merit

to warrant [further] discussion in a written opinion. R. 2:11-

3(e)(1)(E). We affirm substantially for the reason expressed by

Judge DiCamillo in his oral decision.

 We choose to not consider defendant's claim that his

abandonment of his child was caused by the Division's inaction

because he did not raise that argument before the trial judge.

"[I]ssues not raised [before the trial judge] will ordinarily not

be considered on appeal unless they are jurisdictional in nature

or substantially implicate the public interest." N.J. Div. of

Youth & Family Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (citing

Cty. of Essex v. First Union Nat'l Bank, 186 N.J. 46, 51 (2006)).

We only note that, although Judge DiCamillo took issue with the

Division for not responding to Betty's initial call regarding

David living with her, its failure did not frame defendant's

decision to leave his son's care and support to others while he

did nothing to improve his circumstances so that he could care for

or even stay in contact with his child.

 Affirmed.

 12 A-0061-16T2