# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0851-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

H.D.,

     Defendant-Appellant,

and

M.D.S.,

     Defendant.

_____

IN THE MATTER OF M.D.,
a minor.

_____

Argued April 15, 2024 – Decided May 7, 2024

Before Judges Mawla and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0105-22.

Catherine W. Wilkes, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Catherine W. Wilkes, of counsel and on the briefs).

Leah A. Schmidt, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Leah A. Schmidt, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

Appellant H.D. [1] appeals from the June 16, 2022 order finding her seventeen-year-old biological son, M.D., was abused or neglected in violation of N.J.S.A. 9:6-8.21(c). [2] We affirm substantially for the reasons set forth in

---

[1] We utilize initials to protect the confidentiality of the parties. R. 1:38-3(d)(9).

[2] H.D. also appeals from the October 3, 2022 order terminating the litigation because M.D. reached the age of majority, but does not address that order in her briefs. We limit our discussion to the argument raised by appellant on

Judge Wayne J. Forrest's thorough and well-reasoned oral opinion following a fact-finding hearing.

We summarize the facts developed in the record. H.D. and her family were involved with the Division of Child Protection and Permanency ("DCPP") since 2008. H.D. and M.D.'s biological father, M.D.S., divorced in 2008, and M.D.S. moved to South Carolina. H.D. retained sole legal custody of M.D. and his two brothers, J.D. and D.D., in New Jersey.

In 2019, M.D. was beaten by classmates at school and hospitalized with a traumatic brain injury. As a result, he suffered episodes of depression, rage, and post-traumatic stress disorder. He also gained nearly 100 pounds, which caused sleep apnea and necessitated his use of a continuous positive airway pressure ("CPAP") machine when sleeping.

Despite his injuries, M.D. maintained a 3.5 grade point average at a high school for performing and fine arts where he was a vocal major. He was an active member of his church where he ministered, participated in bible study, led youth groups, played piano, and sang in the choir.

_____

appeal. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

In November 2020, M.D. was admitted to Clara Maass Crisis Center after H.D. alleged he was violent toward her and demanded residential placement for him. M.D. disputed H.D.'s account, contending she punched and kicked him and took his work clothes and money. M.D. was discharged to H.D.'s custody.

In May 2021, DCPP received referrals from Newark Beth Israel Medical Center reporting concerns for M.D. Like the November 2020 incident, H.D. alleged M.D. physically attacked her, and M.D. denied it contending she was physically violent toward him. The hospital cleared M.D. for discharge, but H.D. refused to take him home. As a result, M.D.'s Care Management Organization ("CMO") team was forced to temporarily place M.D. in an emergency shelter at Isaiah House. H.D. continued to refuse to allow M.D. to return home. On July 28, 2021, DCPP obtained custody of M.D. and placed him in a resource home. On January 13, 2022, M.D. was reunited with H.D.

The events of February 27, 2022, through March 4, 2022, that underly the court's finding of abuse or neglect were the subject of a June 16, 2022 fact-finding hearing at which the DCPP caseworker, Najiyah Duncan, and H.D. testified. Duncan testified that on February 27, 2022, M.D. called DCPP and reported he had an argument with J.D., which resulted in him having to leave

4

the home and not being allowed back. Specifically, M.D. reported he and J.D. argued after J.D. refused to bring M.D. a washcloth while he was in the shower, and M.D. thereafter argued with H.D. According to M.D., H.D. told him he was no longer allowed to remain in the home, and he left.

H.D. contacted DCPP and reported the incident. She stated "[M.D.] had out of control behaviors which included him hitting [H.D.] and his brothers in the past. [He] was being disrespectful to [her] . . . and she advised him if he continue[d] to be disrespectful, he could not live with her anymore." H.D. told DCPP "[M.D.] decided to pack a bag and leave." H.D. also contacted the police and reported M.D. was missing. The police located M.D. at his school and escorted him home. H.D. refused to allow M.D. to enter the residence.

DCPP responded to the home and spoke with H.D., who confirmed there was an argument earlier that day and she asked M.D. to leave because she was fearful. She did not indicate the argument involved violence. H.D. advised DCPP she was not willing to allow M.D. back into the house.

M.D. was scheduled to participate in two performances at his school later that day and was escorted back to the school for the shows. Because he had nowhere to stay, DCPP arranged to pick M.D. up after the shows to provide emergency shelter. It was agreed that M.D. would call DCPP after the

5

performances, but he did not. Instead, he drove with a friend to South Carolina where his father and his paternal grandmother live. M.D. reported he did not call DCPP as agreed because he was in a fight at the school after the performances and wanted to get out of town. DCPP maintained contact with M.D. in South Carolina. M.D. reported inconsistently he was staying with his grandmother or in an Airbnb rental after visiting his grandmother very briefly, but he did not stay with his father.

On March 2, 2022, H.D. filed an application in her divorce action, seeking joint custody of M.D. with M.D.S. and permission for M.D.S. to enroll M.D. in school in South Carolina. The same day, the Family Part judge conducted a virtual hearing at which H.D., M.D.S., and a representative of DCPP participated, and granted the application for "joint legal custody" of M.D. The order also provided M.D.S. "shall be authorized to enroll [M.D.] in the appropriate school district in South Carolina within seven days."

DCPP contacted M.D. to advise him of H.D.'s custody application so M.D.S. could enroll him in school in South Carolina. According to Duncan, M.D. said he would not remain in South Carolina and "did[ not] believe his mother and grandmother should make plans for him." M.D. stated he wanted

to complete his senior year of high school and graduate with his friends in New Jersey, and he was driving back to New Jersey.

While M.D. was driving back to New Jersey, H.D. disenrolled M.D. from school and shipped his clothes and other belongings, including his CPAP machine, by overnight delivery to M.D.S.'s residence in South Carolina. Duncan testified H.D. told DCPP she would not allow M.D. back into the residence, and she made "some arrangements through [f]amily [c]ourt for [M.D.] to be in South Carolina."

On March 3, 2022, at approximately 1:30 a.m., M.D. arrived home and H.D. refused to allow him to enter the residence. M.D. contacted the police because he had nowhere to go and needed somewhere to stay. Police responded to the residence, and H.D. continued to refuse to allow M.D. to enter the home. H.D. called DCPP and stated M.D. is a violent and aggressive child and he "is supposed to be in South Carolina with his father." H.D. left the residence with her other two children while M.D. and the police were standing in the hallway outside the door.

DCPP arranged for M.D. to stay at Isaiah House for one night and police transported him there. Duncan testified DCPP contacted H.D. the next morning and she maintained her position that she would not allow M.D. into

7

the residence. As a result, DCPP was forced to take custody of M.D. and place him in a resource home. He remained in DCPP's custody at the time of the hearing.

H.D. testified M.D. was living in a resource home prior to January 13, 2022, because he "threw [her] on the bed and choked [her]" after she refused to allow him to go to the library because he was grounded. She allowed him back into her home on January 13, because "[h]e had nowhere to go" and she was hoping they "would be able to work through it and he would[ not] be violent anymore."

On February 27, she "heard yelling and screaming" and "M.D. was cursing and . . . screaming and charging at J.D., trying to hit J.D." M.D. was 5'7" tall and over 300 pounds. After she told him to calm down, M.D. "started yelling, screaming, and cursing" at her. She testified she "told him he cannot have that aggressive behavior in the home anymore. And if he'[ i]s going to have that behavior, he cannot live at [her] house." M.D. then "packed the bag" and left. H.D. reported the incident to DCPP and the police. H.D. attended the school performances later that day because all her children were involved. She went home with her two other children after the shows. She did not have any contact with M.D. before or after the shows.

8

The following afternoon, H.D. learned from DCPP that M.D. drove to South Carolina after the shows. H.D. attempted to call M.D.S., but he did not answer. She then called H.D.'s grandmother who said, "he was down there" but she turned him away. According to H.D., she and the grandmother then "made plans for him to stay down there because . . . he was missing school." She contended the grandmother "was going to get custody on her own" but Duncan said H.D. and M.D.S. would need to have custody, so H.D. filed the custody motion herself. According to H.D., she filed the motion because "M.D. was in South Carolina with his father. He was not listening and was very aggressive up here. It was in his best interest to stay with his father in South Carolina."

On March 2, after the court issued the order granting joint custody, H.D. "went to the school in New Jersey[,] . . . showed them a copy of the [c]ourt [o]rder . . . [and] told them [she] was transferring M.D. to school in South Carolina." The school then contacted the school in South Carolina and faxed M.D.'s transcripts and other documents necessary for enrollment. H.D. "overnighted three boxes of clothes, sneakers, [his CPAP] machine, [and] his chargers[,] so he [could] use his laptop[,] . . . to his father's house." At that

point, she "had done everything on [her] part" and "all [M.D.S.] had to do [was] show up at the school with M.D."

In the early morning hours on March 3, "[t]he police knocked at [H.D.'s] door. When [she] opened the door, the police [were] there with M.D." H.D. testified:

> The police wanted to know if I would allow M.D. to come into my home. M.D. made it clear that he did not want to come into my home, that he wanted to be at the Isaiah House. I told the police that M.D. was very violent. I had . . . two other children in my home who [were] absolutely fearful [for] their lives. And I told him that I was going to contact [DCPP], [and] the hotline, which I did. And they told me that they would be bringing him to the Isaiah House. So I made sure he was safe and knew that he had a place to go . . . . And they said the next day, once again in the morning [because] they were emergency workers, that . . . Duncan would contact me and we would move forward from there.

When H.D. called DCPP, she "told [DCPP] that M.D. was supposed to be in South Carolina with his father, that all of a sudden he showed up at [her] door with the police."

On March 4, H.D. filed an emergent application in her divorce action because M.D. returned to New Jersey and was not in South Carolina. According to H.D., she filed that application because "[h]is father agreed to take him, and M.D. came back to New Jersey." The court denied the emergent

application. H.D. contacted Duncan and told her she "wanted to make sure [her] son was still safe, even though he was too aggressive and violent to be in [her] home." As a result, Duncan said "[DCPP] would move forward and take custody of" M.D. and H.D. "agreed for them to take custody." On March 7, DCPP filed a complaint for custody alleging H.D. had abused or neglected M.D. The same day, following a hearing on an order to show cause, M.D. was placed in a resource home and re-enrolled in school in New Jersey by DCPP.

Following the fact-finding hearing, Judge Forrest found DCPP proved by a preponderance of the evidence that M.D. was abused or neglected as defined in N.J.S.A. 9:6-8.21(c)(4)(a) and (5). The judge reviewed the extensive history of the case and the competing and inconsistent versions of prior events conveyed by H.D. and M.D. as set forth in the documents in evidence. He found by refusing to allow M.D. to enter her residence and provide food and shelter for him on February 27, 2022, and after he returned from South Carolina on March 3, 2022, H.D. failed "to exercise a minimum degree of care to provide [M.D.] at all times with appropriate, safe shelter, food, and medical care." The judge also found M.D. was abandoned because H.D. failed "to care for and keep control and custody of a child" when she "refused the public officials who [were] returning her child to her on two occasions." The court

11

found she "refused to accept the return of custody of the child. And she . . . affirmatively said that the public officials have to keep the child, have to support the child, have to maintain the child at the expense of the public. And the public[ is] continuing to do that."

On appeal, H.D. argues: (1) M.D.'s statements regarding the events of February 27 and March 3, 2022, are uncorroborated hearsay and are not sufficient to find H.D. abandoned or neglected M.D.; (2) the court's speculation and implicit bias regarding the May 2021 referral and the events of February 27 and March 3, 2022, cannot sustain a finding of abandonment or neglect; and (3) the court's findings that H.D. abandoned M.D. and failed to provide him with a minimum degree of care are not supported by a preponderance of the evidence.

Appellate review of the Family Part's abuse or neglect finding is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015). The court must determine whether the decision "is supported by 'substantial and credible evidence' on the record." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)).

"[B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Moreover, appellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" Id. at 342-43 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." F.M., 211 N.J. at 448 (quoting E.P., 196 N.J. at 104). "[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010).

"In general, 'Title 9 controls the adjudication of abuse and neglect cases.'" Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 177 (2015) (quoting M.C. III, 201 N.J. at 343). "The focus of Title 9 'is not the "culpability of parental conduct" but rather "the protection

13

of children."'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017) (quoting E.D.-O., 223 N.J. at 178).

DCPP "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). Each case of alleged abuse "requires careful, individual scrutiny" and is "generally fact sensitive." Id. at 33. The proofs must be evaluated based on the totality of the circumstances. Id. at 39.

Title 9 defines an "abused or neglected child" as one under the age of eighteen whose

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4).]

A-0851-22

The "minimum degree of care" element in subsection (c)(4) reflects "the intermediary position between simple negligence and the intentional infliction of harm." A.B., 231 N.J. at 369 (citing G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 179 (1999)). After considering the totality of the circumstances and assessing each case on its facts, the court must determine whether the parent or guardian "'fail[ed] to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child.'" Ibid. (quoting G.S., 157 N.J. at 181).

"Included under Title 9 is a separate category of abuse or neglect: 'willful abandonment.' A child less than [eighteen] years of age may be found to be abused or neglected if the child has been willfully abandoned by his parent or guardian." A.B., 231 N.J. at 368-69 (quoting N.J.S.A. 9:6-8.21(c)(5)).

N.J.S.A. 9:6-1 defines abandonment of a child as:

> (a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public . . . .

15

Abandonment pursuant to N.J.S.A. 9:6-1(a) requires the parents' purpose to be to "forego all parental duties and relinquish all parental claims to the child." Lavigne v. Fam. & Child.'s Soc'y, 11 N.J. 473, 480 (1953). "Abandonment requires a finding that parents, although physically and financially able to care for their children, willfully forsook their parental responsibilities. The concept of abandonment entails a willful surrender or intentional abdication of parental rights and duties." In re Guardianship of K.L.F., 129 N.J. 32, 39 (1992) (citations omitted). "The word 'willfully' in the context of this statute means intentionally or purposely as distinguished from inadvertently or accidentally." State v. Burden, 126 N.J. Super. 424, 427 (App. Div. 1974).

Neither N.J.S.A. 9:6-1(b) nor (c) requires that DCPP prove a parent acted willfully or permanently forsook the child. In a different context, we noted the distinction between subsection (a) and subsections (b) and (c).

> The alternative definitions of abandonment in N.J.S.A. 9:6-1 also tend to support our view. Both of the other definitions proscribe "failing to care for and keep the control and custody of a child" so that the child shall be exposed to harm, subsection (b), or shall become a financial burden upon the public or others not chargeable with the child's care, subsection (c). Both of those alternatives do not require a permanent relinquishment and do not use the word forsaken which is employed, in stark contrast, only in

16

subsection (a). We believe the Legislature was thereby drawing a line between harms, physical, moral, or financial, that might befall the child or others from even a temporary leaving, and the "ultimate act" of neglect described by "willfully forsaking."

[State v. N.I., 349 N.J. Super. 299, 311-12 (App. Div. 2002).]

We are satisfied Judge Forrest's findings are supported by substantial credible evidence in the record and should not be disturbed. This includes the judge's determination that H.D. refused to allow M.D. to enter her residence on February 27 and March 3, 2022, and thereby failed to exercise a minimum degree of care in supplying M.D. with adequate food, clothing, and shelter. Likewise, the judge's finding that H.D. failed to care for M.D. so that he was liable to be supported and maintained at the expense of the public is supported by substantial credible evidence, including H.D.'s own testimony.

We are not persuaded by H.D.'s contention that M.D.'s statements regarding the events of February 27 and March 3 were uncorroborated hearsay, and the court should have conducted an in-camera interview of M.D. H.D. did not object to these statements or request an in-camera interview at the hearing. We generally do not consider issues raised for the first time on appeal unless they are jurisdictional in nature, substantially implicate a public interest, or

otherwise constitute plain error.  See Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973).

In addition to being waived, we conclude H.D.'s arguments lack merit. M.D.'s statements that H.D. refused to allow him back into the residence after March 27 were corroborated by H.D.'s own statements to DCPP and the police, as well as her own testimony at the hearing.  H.D.'s claim that she merely gave M.D. the chance to leave on February 27 is of no moment.  The judge relied on the undisputed fact that H.D. refused to allow M.D. to enter the residence and, in doing do, refused to provide shelter for her child.  Whether H.D. initially forced M.D. to leave or gave him the choice to leave was not the basis for the judge's decision.

H.D.'s contention that the judge failed to recognize M.D.S. was "the custodial parent on March 3, 2022" based on the March 2, 2022 order granting H.D. and M.D.S. "joint legal custody" is not convincing.  That order did not, as H.D. argues, designate M.D.S. as the custodial parent or grant him physical custody of M.D.  Rather, the order provided both parents equally shared the responsibility of "joint legal custody."

In addition, H.D. was aware M.D. was never in the custody of M.D.S. between February 27 and March 3.  In fact, she was aware M.D. did not stay

18

with M.D.S when he was in South Carolina, and M.D.'s grandmother "turned him away" when he arrived at her residence. H.D.'s claim that she believed M.D.S. was the custodial parent of M.D. on March 3 is not supported by any evidence in the record. M.D. was at her residence in New Jersey on March 3. M.D.S. was hundreds of miles away in South Carolina and, based on her own testimony, H.D. knew M.D. was never in the custody or control of M.D.S. at any time after the March 2 order was entered. H.D. was obligated to fulfill her responsibilities as the joint legal custodian of M.D. and failed to do so.

To the extent we have not addressed any of H.D.'s remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0851-22