# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1571-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

M.J.,

     Defendant-Appellant,

and

H.J.,

     Defendant.

_____

IN THE MATTER OF L.J. and
F.J., minors.

_____

Argued May 12, 2025 – Decided July 16, 2025

Before Judges Sabatino, Jacobs and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FN-16-0149-22.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Adrienne Kalosieh, of counsel and on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor L.J. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

Defendant M.J. ("Melanie")[1] appeals from a Family Part order finding she abused and neglected her biological child, L.J. ("Laurie"). On appeal, both defendant and Laurie's law guardian argue the facts established at the hearing, and considered in totality, were insufficient to meet the high bar necessary to prove Melanie willfully abandoned Laurie within the meaning of N.J.S.A. 9:6-8.21(c)(5). We agree and reverse the trial court's judgment.

---

[1] We use pseudonyms and initials to protect the parties' confidentiality. R. 1:38-3(d). Defendant H.J. ("Harry"), Laurie's biological father, does not appeal this decision and was dismissed from the litigation.

I.

Laurie was born in February 2006, and is one of Melanie's four biological children. Melanie is the primary parent for her family which includes two children with severe autism, a minor, F.J. ("Farrah") and an adult, K.J. ("Keith"), along with one adult child, Y.J. ("Yvonne"). In the years before the incident at issue in this case, Melanie's family had some contacts with the Division of Child Protection and Permanency that were mainly related to Keith's behavioral issues and Laurie's chronic behavioral and mental health challenges. The relationship between Melanie and Laurie was periodically stormy as mother and daughter attempted to navigate Laurie's "multiple [mental health] diagnoses." To address these issues, the Division assisted Melanie with therapeutic interventions that Melanie combined with her own advocacy efforts.

In July 2021, Melanie planned and prepared to travel to California with Farrah for a long-promised, one-week trip to Disneyland. Before leaving, Melanie arranged that Laurie, then sixteen years of age, was supervised by her twenty-two-year-old adult daughter, Yvonne, and Melanie's boyfriend, "Tony", who agreed to care for Keith while Melanie was going to be away. The week-

long vacation was planned for April 22, 2022, and was greatly anticipated by Farrah as a reward to her for good behavior.

Shortly before the trip, Melanie developed certain safety concerns about Laurie. This uneasiness was specifically triggered by the delivery of a curious fruit basket and teddy bears to their home that included notes causing Melanie to suspect Laurie might be the victim of exploitation and, by extension, that strangers might also be aware of their address. As the trip was less than a week away, Melanie nevertheless decided to go on the trip to keep her long-standing promise to Farrah. They departed on Friday, April 22, 2022.

While in California, Tony advised Melanie that another basket had been delivered to their residence. This second delivery caused additional concern to Melanie for Laurie's safety and was compounded by the fact that Melanie was now "3,000 miles away." Consequently, Melanie "contacted the police, as well as contacted the Division. I contacted the school. I contacted [her care management organization ("CMO")]. I contacted a lot of people from Monday of that week until Wednesday of the removal demanding help and at that point, demanding the removal."

As explained in her testimony, Melanie did so "because I was in California and I could not protect her. I could not be home. A lot was going

on. I didn't know what she was doing. . . . Anyone can come to my home and harm her or us. My address was compromised."

Melanie contacted the Division "three days in a row [on] Monday [April 25], Tuesday [April 26], and Wednesday [April 27, 2022]."

Through its caseworker, the Division acknowledged the frequency of the referrals, noting "this is the third time that the reporter is calling [the Division] since [Monday, April 25, 2022]." The Division's record of these contacts notes the mother is currently in California and "is not coming to New Jersey until [Laurie] is removed from the home." Specifically:

> [M]om told the reporter today that she is going to abandon [Laurie] and that she is not coming back. Mom said that she is going to tell [Yvonne] to stop going to the house to provide supervision for [Laurie] and that she is going to have [Tony] change the locks so that [Laurie] cannot get into the house when she comes home after school.

Following this, the Division opened an investigation on April 27, 2022. The assigned caseworker spoke with Laurie at school. Laurie expressed consternation that Melanie intended to change the locks to the home. Laurie expressly acknowledged her concern that Melanie might change the locks on the home in order to prevent the presence of a particular friend of Laurie's, of whom Melanie did not approve. Continuing the investigation, the caseworker

5

traveled to the home and ascertained the door locks, in fact, had not been changed.

Later that day, when Melanie called to check in with Yvonne, she was surprised when Laurie answered the phone because Melanie believed the Division intended to remove Laurie. When Melanie heard that Laurie remained in the house and had also been notified that Laurie's friend was in the home, Melanie became "upset and furious."

Convinced Laurie was in a dangerous environment and believing the Division's intervention was crucial to Laurie's safety, Melanie again called the Division and the Bloomingdale Borough Police department asking for Laurie to be placed into the Division's custody until she returned. The police refused direct intervention but performed a "welfare check." The police also made a referral to the Division.

Melanie made her own report to the Division. The Division's record reflects:

> The mother stated that she went to California to "abandon her" and to have her placed elsewhere. The mother said that she is not coming back to the home until the child is removed, and said that she would "slit her from her vagina to her throat" if the child was still there when the mother came back. The mother "beat her up" two weeks ago, but the mother said that

6

the child injured her, and that the child did not have any injuries.

Following this referral, the Division eventually conducted its own welfare check on Laurie and effectuated an emergency Dodd removal[2] of Laurie from the home. Harry, Laurie's father, declined to take custody of his daughter when the Division contacted him and also failed to provide an alternative plan for Laurie's care.[3]

The caseworker contacted Melanie to advise her that Laurie would be removed and documented her response to this notification: "Immediately [Melanie] stated, 'oh good' and 'you're removing her.'" The record also reflects Melanie responded, "oh that's great" and "awesome." According to the caseworker's documentation, "in that same sentence, [she] stated that she did care for [Laurie], but she's just angry the way that [Laurie's] behaviors were and how the Division and CMO have been conducting their—their intervention with the family." The notes state that Melanie was observed to be

---

[2] A "Dodd removal" refers to the emergency removal of a child from a home without a court order, pursuant to the Dodd Act. See N.J.S.A. 9:6-8.21 to -8.82.

[3] Despite Harry's refusal to intervene and to assist Laurie, the Division did not pursue abuse or neglect findings against him.

A-1571-23

"remorseful" and "just indicating that she was happy that [Laurie] was going to be removed from the home."

Once Melanie was advised that Laurie was going to be removed from the home, she sent her cousin to the house to change the locks to secure the home until she returned.

Ultimately, the Division filed a Title 9 complaint seeking care, custody, and supervision of both Laurie and Farrah under N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-11.[4] At the initial hearing, held on April 29, 2022, Melanie expressed her frustration with her efforts to have the Division provide her family with services. She noted, "I've requested [assistance] from [the Division] for two years, I have emails, voice recordings, everything. I'm an advocate for my children, for their special needs. I've done nothing wrong. I've begged for services . . . for two years while this child physically assaulted me—she's doing now." Melanie pleaded "for the safety . . . of my other children . . . . This Division has never once offered me assistance. I keep mental health for myself, CMO services. [Laurie] was homeless all summer." Melanie "kept telling the Division out of anger I say these things because they're not helping."

---

[4] The Division later dismissed its complaint regarding Farrah.

A-1571-23

Ultimately, the matter proceeded to a fact-finding hearing.

At the hearing, Melanie testified about her repeated, but unsuccessful, attempts to obtain services and for her support for Laurie's complex behavioral and emotional problems from the Division. She explained that the removal request arose from acute concerns for Laurie's safety while Melanie was out of state, the intractability of Laurie's behaviors, and the inability of available services to address the situation. Melanie acknowledged making statements to the Division announcing abandonment, but similarly testified her intention was to compel intervention rather than to repudiate her parental responsibilities.

Division workers and social services staff testified regarding the timeline of events, the substance of Melanie's calls and statements which included her direction to change the house locks, and the lack of available or suitable adult supervision for Laurie at the time of removal. The Division documented that Melanie, by her own written and telephonic communications, stated she would not return to New Jersey until Laurie was removed from her care.

Before rendering her decision, the trial judge engaged in this colloquy with the Deputy Attorney General ("DAG"), counsel for the Division:

> [THE COURT:] At what point in time do you believe
> the abandonment started? And [why I say] that
> because we have a trip allegedly to California that
> started April [22nd]. And then you have events that

began on April 27th, so 22[nd] to 27[th]. Right, so I'm trying—just so you know . . . I'm framing chronology wise the events and asking myself as I frame it and take a snapshot, does this support—not in and of itself, but a step towards a finding of abandonment. So, I guess that's my question. Do you believe or do you—is it your position that the moment she left to go to California, the California trip, the purpose was to abandon?

[DAG]: I don't think Your Honor that the trip in and of itself was the abandonment, I think it was the totality of the circumstances. It was the trip—it was everything that occurred really within that week. The trip along with everything that occurred really within that week. The trip along with her admissions to the State Central Registry indicating that she was abandoning her, in conjunction with the statements she later makes to the caseworker about what happened, in conjunction with the case worker being present when the locks were changed.

So, it would be hard for me Your Honor to identify one specific moment, because I think the [c]ourt needs to consider all of those events at the same time, which all occurred in that time period Your Honor.

THE COURT: Do believe the purpose of the trip to California was to abandon her?

[DAG]: I—I think that was what [Melanie] indicated what her intent was, yes.

THE COURT: Okay, because she called the— she called the Division on April 27th saying, "I'm in California and I'm abandoning her." Is that why?

10

A-1571-23

[DAG]: Correct.

As a predicate matter, the judge found Melanie to be credible:

> I . . . found [Melanie] to be credible. I found that she answered all the questions that were asked. Often—and sometimes answering questions, that I think, were difficult questions and thereafter giving what were difficult answers for her. I found her candor to be such that she had an inherent believability to her testimony. I think at the end—and I'll say this now, I believe she was a very frustrated parent trying to get help for her children, and her child. But what—what the series [of] events thereafter on a preponderance of the evidence standard, which is before me, leads me to conclude the finding that the substantiation [of abandonment] should be upheld. It doesn't mean I didn't believe her, or I didn't find her credible. In fact I found her very credible, and you'll hear that in a minute.

The judge ultimately concluded Melanie abandoned Laurie:

> I believe [Melanie], through a series of actions leads the [c]ourt to the conclusion that she abandoned [Laurie]. In here I took each moment of time, pretty much a snapshot—a frame of each of that and asked myself whether that supported, ultimately, a forsaking of parental duties, i.e. an abandonment or put her at an imminent risk of danger.

The judge noted:

> There's nothing in the record to suggest that between April 22nd and April 27th [Melanie's] trip to California was for the purpose of abandoning [Laurie]. However, series of events occurred thereafter that indicated that while she was in California she

11

abandoned [Laurie]. Not abandon her prior to leaving for California.

The judge noted specifically as to Melanie's use of the term "abandonment" to the Division wasn't used "for a legal reason, in the legal terms of abandonment." Rather, "it was a reflection of her desperate need for help in seeking a reaction and attention."

Central to her decision was what Melanie "next says and does that this [c]ourt feels that based on a preponderance of the evidence she abandoned [Laurie,]":

> In the same call, [Melanie] says she's not returning home until the child is removed, and that she would slit her from her vagina to the throat if the child was there when she returned. [Melanie] said she had beat up [Laurie] two weeks earlier and reported that [Tony] was leaving the home, and no one will be there to take care of [Laurie].

Ultimately, the judge found,

> [t]he record set forth above contains substantial credible evidence to support a finding of neglect under both [N.J.S.A. 9:6-8.21](c)(4) and [N.J.S.A. 9:6-8.21(c)](5). Not only did defendant fail to exercise a minimal degree of care she clearly and explicitly refused to care for her child at all when on April 27th she willfully refused to return to the home until [Laurie] was removed, removed the very caretakers that were present for her, and threatened harm to her in the event she was still home and asked for her removal.

Although the Division's decision to remove Laurie from the home pre-existed Melanie's decision to change the locks, the judge also concluded:

> [Melanie] locked [Laurie] out of the home with no plan for her, aside from the home that the Division would remove her. Not only did [Melanie] lock [Laurie] out of the home without a plan for her but informed the Division that she had no plan to reunify with her and did not want her home when she returned from California. [Melanie] abandoned her daughter leaving her along with the Division worker and forcing the Division to assume care, custody, and control.
>
> A parent is not allowed to abandon a child merely because the child's difficult or as here alleged mental health issues. Neither of those circumstances mitigate the fundamental responsibility of the parent to provide care for the child. But for the Division's intervention defendant . . . [Melanie] left [Laurie] without a safe and secure place, exposing her to actual imminent risk of harm and willfully forsaking a parental responsibilit[y] under the abandonment statute.

At the conclusion of the opinion, the judge noted that she wished to clarify,

> [w]hile I am familiar with case law that says the court can mirror its findings as to the evidence before it and having had—having had the conference with the attorneys I realize, and I believe that the argument on risk of harm under the c(4) was really not for its own basis a separate basis. But instead was as evidence of the abandonment in c(5). Meaning that [Laurie] was put at a risk of harm under the definitions under the

13

statute, which is in c(4) as we know. Because she—a minimum degree of care I mean. Because—and that led to the willful forsaking of the child and failing to care and keep her in their control. It's all mirrored together . . . .

She continued,

> therefore, any reference to the c(4) in this [c]ourt's decision is not to be its own basis for abuse and neglect but rather, again, part of the finding under c(5) for abandonment.

The judge issued a written order memorializing her opinion including this statement of reasons:

> The [c]ourt has determined that [Melanie] abused and/or neglected [Laurie] in that she abandoned [Laurie] as defined by N.J.S.A. 9:6-8.21(c)(5). The evidence presented at fact finding demonstrates that [Melanie] while in California failed to make an appropriate plan for [Laurie] by not having an appropriate caretaker, had change[d] the locks at [Laurie]'s home and had indicated to the Division that she will not return until the child was removed. She also indicated that she would slit her vagina to her throat if the child was there when she returned from California. As a result of [Melanie] willfully forsaking her parental responsibilities, the Division had no option but to remove [Laurie].

Melanie appealed and raised this single issue for our consideration:

> WHERE THE SUPREME COURT HAS DECLARED THAT PARENTS MAY REQUEST ASSISTANCE WITHOUT REPRISAL OR CLAIM OF FAILING TO MEET THEIR CHILD'S NEEDS, THE TRIAL

14

COURT ERRED IN HOLDING THAT [MELANIE]'S PLEA, AND THEN DEMAND, THAT [THE DIVISION] ASSUME TEMPORARY CARE WHILE SHE WAS 3,000 MILES AWAY INDICATED A PERMANENT GIVING UP OR RELINQUISHMENT OF THE CHILD.

II.

Our review of a Family Part judge's abuse and neglect findings is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015). We must, therefore, determine whether the judge's decision is "supported by 'substantial and credible evidence'" in the record. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)). "[B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Moreover, appellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" Id. at 342-43 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P, 196 N.J. 88, 104 (2008)). A family judge's decision should not be overturned unless it went

15

"so 'wide of the mark'" that reversal is needed "to correct an injustice." F.M., 211 N.J. at 448 (quoting E.P., 196 N.J. at 104).

However, "[t]here is an exception to th[e] general rule of deference: [w]here the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993)). When the issue presented turns on a legal conclusion derived from the family judge's factfinding, "we are not required to defer." N.J. Div. of Youth & Fam. Servs. v. A.R., 419 N.J. Super. 538, 542-43 (App. Div. 2011).

This is such a case.

### III.

### A.

"In general, 'Title 9 controls the adjudication of abuse and neglect cases.'" Dep't of Child. & Fams., Div. of Child. Prot. & Permanency v. E.D.-O., 223 N.J. 166, 177 (2015) (quoting M.C. III, 201 N.J. at 343). "The focus of Title 9 'is not the "culpability of parental conduct" but rather "the protection

of children.'"" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017) (quoting E.D.-O., 223 N.J. at 178).

To substantiate allegations of abuse and neglect at a factfinding hearing, the Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material[,] and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). Each case of alleged abuse "requires careful, individual scrutiny" and is "generally fact sensitive." Id. at 33. The proofs must be evaluated in their totality. Id. at 39.

Title 9 defines an "abused or neglected child" as one under the age of eighteen whose

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [the child's] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(a) to (b).]

17

The "minimum degree of care" element in subsection (c)(4) reflects the "intermediary position between simple negligence and the intentional infliction of harm." A.B., 231 N.J. at 369 (citing G.S. v. Dep't of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 179 (1999)). After considering the totality of the circumstances and assessing each case on its facts, the court must determine whether the parent or guardian "failed to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Ibid. (quoting G.S., 157 N.J. at 181).

"Included under Title 9 is a separate category of abuse or neglect: 'willful abandonment.' A child less than [eighteen] years of age may be found to be abused or neglected if the child has been willfully abandoned by his [or her] parent or guardian." A.B., 231 N.J. at 368-69 (quoting N.J.S.A. 9:6-8.21(c)(5)).

N.J.S.A. 9:6-1 defines abandonment of a child as

> (a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public . . . .

Abandonment according to N.J.S.A. 9:6-1(a) requires the parents' purpose to be to "forego all parental duties and relinquish all parental claims to the child." Lavigne v. Fam. & Child.'s Soc'y of Elizabeth, 11 N.J. 473, 480 (1953) (quoting Winans v. Luppie, 47 N.J. Eq. 302, 305 (1890)). "Abandonment requires a finding that parents, although physically and financially able to care for their children, willfully forsook their parental responsibilities. The concept of abandonment entails a willful surrender or intentional abdication of parental rights and duties." In re Guardianship of K.L.F., 129 N.J. 32, 39 (1992) (citation omitted). "The word 'willfully' in the context of this statute means intentionally or purposefully as distinguished from inadvertently or accidentally." State v. Burden, 126 N.J. Super. 424, 427 (App. Div. 1974).

In A.B., the Court cited, with approval, Chief Justice Vanderbilt's formulation of the pre-Title 9 law of abandonment, noting the parent's conduct needed to meet "an extremely high bar" demonstrating "a 'settled purpose' to forego her parental rights." A.B., 231 N.J. at 371-72 (quoting Lavigne, 11 N.J. at 480); see also In re Guardianship of D.M.H., 161 N.J. 365, 377 (1999) (noting that under Title 30, "abandonment may not be based on parental conduct that is only uncertain, ambivalent[,] or equivocal in fulfilling parental

duties" (citing <u>In re Adoption of a Child by D.M.H.</u>, 135 N.J. 473, 488 (1994))).  Ultimately, the Court in <u>A.B.</u> concluded the evidence failed to establish defendant "willfully relinquished her parental rights" and therefore did not abandon her child.  <u>Id.</u> at 372.

B.

In light of these principles, we determine the trial judge's conclusion lacked sufficient evidential support to justify a finding that Melanie abandoned Laurie.  The statements made by Melanie, which the trial judge found to be credible, together with her actions, which the judge concluded were those of a person acting out of desperation, do not demonstrate that Melanie possessed the mens rea to "willful[ly] surrender or intentional[ly] abdicat[e her] parental rights and duties."  <u>K.L.F.</u>, 129 N.J. at 39.

Considered in totality, Melanie's actions do [] not evidence a "settled purpose to forego all parental duties and relinquish all parental claims to [Laurie]."  <u>D.M.H.</u>, 161 N.J. at 376.  At best, the evidence, tempered with the judge's credibility findings favoring Melanie, is in equipoise as to whether Melanie abused and neglected Laurie.  Therefore, we conclude the Division did not carry its burden of proof.  <u>See</u> Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. 5.1 on N.J.R.E. 101(b)(1) (2024-2025).

Although we do not condone the language used by the mother, nor her approach to involving the Division, an objective review of all circumstances demonstrates that her actions were rooted in Melanie's genuine effort to seek help and to obtain support from the Division.

In the three days before Laurie's removal, and from California, her mother made multiple requests for assistance each day to the CMO, the school, the Division, and the police for assistance. This persistence underscores Melanie's dedication to Laurie's well-being. Though the language she chose to use in the referral was extreme and explosive, it is reasonable to assume that the language reflected Melanie's frustration and desperation after earlier efforts to obtain prompt aid from these entities was unsuccessful.

The trial court recognized that Melanie's temporary, week-long planned trip to California, by itself, did not constitute abandonment of Laurie. Additionally, after Laurie's removal, Melanie promptly returned home, actively participated in the pending litigation, remained in consistent contact with the Division, and continued to cooperate with their requirements. These examples reaffirm Melanie's commitment to maintain her parental role, not to abandon it, despite her words to the contrary.

A-1571-23

Although the trial court concluded that Melanie's decision to change the locks evidenced abandonment, our legal assessment differs following our de novo review. It is most reasonable to conclude from Melanie's testimony, combined with the temporal progress of this endeavor, Melanie changed the locks only <u>after</u> Laurie's removal. This sequence of actions reinforces the position that Melanie did not intend to oust Laurie from the house involuntarily and indefinitely. Rather, the action was designed, as Melanie noted, to secure the home until her return. Further, the fact Melanie first notified the Division of her intention to change the locks to her home, rather than immediately changing them, solidifies her transparency. This sequence of actions reinforces the trial judge's finding of Melanie's credibility and intent to remain as Laurie's parent.

Although Melanie's expressed reaction to Laurie's removal may have appeared sarcastic, such a response does not diminish Melanie's desire, demonstrated through years of advocacy for her daughter, to remain an active and caring mother to her. Melanie's imprudent comments, when viewed in context, represented a desperate appeal for intervention rather than a renunciation of her responsibilities.

A-1571-23

At bottom, the record supports that Melanie did not abandon Laurie. Her repeated efforts to seek help, immediate return and cooperation following the removal, and consistent focus on Laurie's welfare reflect her ongoing commitment as a mother.

Our opinion based on the distinctive facts and circumstances of this case should not be misconstrued as general approval of parents locking their minor children out of their homes, or as a dilution of the protective child welfare policies underlying the abandonment statute. We stress that in this case the parent unsuccessfully made repeated attempts to obtain the assistance of the Division and other authorities without success while she was over 3,000 miles away, and was in an unusually challenging situation. We also recognize the age of the minor and the history that preceded the events at issue.

Although we reach a different legal conclusion than the trial court, we similarly appreciate this is a difficult case and that the court was clearly endeavoring to navigate the competing considerations of this unique record within the Title 9 framework. Indeed, our disposition is largely founded upon the court's finding that the parent's testimony was credible.

Reversed and remanded to the trial court to enter an order consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1571-23